Argued and submitted September 26, 1983, affirmed March 7, reconsideration denied
April 6, petition for review denied April 24, 1984 (297 Or 82)

MEYER et al,
*Petitioners,*
*v.*

CITY OF PORTLAND et al,
*Respondents.*

(82-077, 82-078; CA A27513)

678 P2d 741

Paul R. Meyer, Portland, argued the cause for petitioners. With him on the briefs was Kobin & Meyer, P.C., Portland.

Kathryn Beaumont Imperati, Assistant City Attorney, Portland, filed the brief for respondent City of Portland.

Stephen T. Janik, Portland, argued the cause for respondent Forest Park Estate. With him on the brief were Susan M. Quick and Ball, Janik & Novack, Portland.

Kevin L. Hanway, Lake Oswego, filed the brief for respondent Home Builders Association of Metropolitan Portland.

Before Richardson, Presiding Judge, and Warren and Rossman, Judges.

WARREN, J.

## WARREN, J.

Petitioners appeal an order of the Land Use Board of Appeals (LUBA) affirming the City of Portland's (city) approval of a planned unit development (PUD) preliminary plan and approval of tentative subdivision plats which constitute the first of several development phases. Petitioners challenge LUBA's approval of the city's action for a number of reasons, most of which flow from the city's alleged failure to make the findings of fact required by the Portland City Code (Code). We affirm.

The city approved the application for a conditional use permit to develop the PUD on approximately 600 acres of undeveloped land within the city.[1] The area is zoned R-10 to permit use of the land for single family dwellings,[2] but high density development as a PUD is permitted in R-10 zones, subject to certain other regulations including those governing conditional use permits. The area is subject to severe risk of landslide.

Obtaining approval to develop a PUD is a two-stage process. An applicant first presents a preliminary plan outlining the proposed development in substantial detail.[3] The

---

[1] The city's comprehensive land use plan and implementing ordinances have been acknowledged by the Land Conservation and Development Commission to be in compliance with statewide goals, and therefore the city ordinances are applicable to this case. ORS 197.175(2)(d).

Subsequent to LUBA's order, the city has amended a number of ordinances governing the PUD approval process.

[2] Most of this area was rezoned in September, 1975, from R-20 to R-10 so that the area could be developed as a PUD. The approval of the zone change contains several conditions for development in the light of the landslide potential in the area. Whether or not those conditions have been complied with is not at issue in this case.

[3] Code section 33.79.060 (*amended by* City Ordinance 154437, 1983) sets forth the information that must be contained in the application for preliminary plan approval. It provides, in pertinent part:

"(b) Preliminary development plan approval. To apply for approval of a preliminary development plan, the applicant shall submit the following:

"(1) A completed conditional use request form with the appropriate signatures. A fee shall be charged in accordance with the provisions of Section 33.114.122(10).

"(2) Legal description of the site proposed for the PUD.

"(3) Statement of planning objectives achieved through the use of the PUD and a description of the proposed character of the development and relationship to surrounding land uses.

preliminary plan is the subject of a public hearing before a hearing officer, who may reject the plan, approve it as submitted or approve it with such conditions as are necessary to assure compliance with the city's comprehensive land use plan. The hearing officer's decision may be appealed to the city council, which has authority to "affirm, reverse or modify in whole or in part any decision of the hearing officer. * * *" Code section 33.114.070(d). After preliminary approval, the second stage of the process begins. The applicant proceeds with more detailed planning and must submit a final plan to the planning director within three years. If the planning director determines that the final plan is complete and complies with the preliminary plan approval and any conditions

---

"(4) Statement of the proposal's conformance to the Comprehensive Plan, adopted by the City Council.

"(5) Outline of the proposed preliminary development plan including land use allocations, total number and type of housing units, amount of site area in roadways, amount of open space, and the number of parking spaces.

"(6) A proposed site plan showing:

"A. Existing site conditions including topography, watercourses, significant vegetation, floodplains, unique natural features, identified fish and wildlife habitats, and existing storm, sanitary and water facilities.

"B. The approximate location of dwelling units or building sites with graphic or written support material indicating the character of the proposed units.

"C. The existing and proposed traffic circulation system serving the development, including off street parking and points of access to existing public rights-of-way, and a plan notation or descriptive narrative outlining ownership of streets and parking areas.

"D. Proposed location and treatment of any public or common areas including open spaces, park or recreation areas and school sites.

"E. The existing and proposed pedestrian circulation system.

"F. Proposed conceptutal utility plans including sanitary sewers and water lines and provisions for storm drainage.

"(7) Information on land areas contiguous to the proposed PUD to indicate the relationships between the proposed PUD and existing adjacent areas, including zoning classifications, land uses, densities, circulation systems, public facilities, and unique natural features of the landscape.

"(8) If the PUD is being proposed for phased development, a description and timing plan for the approximate phases according to the requirements of 33.79.080.

"(9) If the applicant is requesting simultaneous subdivision approval, a tentative subdivision plat that meets the requirements of Section 34.20 of the Subdivision Code."

attached to that approval, the planning director must approve the final plan. The applicant may appeal an adverse decision by the planning director to a hearing officer, but an opponent of the plan may not appeal a decision to approve the final plan. The approval process for subdivision plats that constitute phases of a PUD are essentially the same and may proceed simultaneously with the PUD process.

Before approving a preliminary PUD plan, the city is required by its code to make certain findings. Code section 33.79.070(b) (*amended by* City Ordinance 154437, 1983) requires findings that:

"(1) The proposed PUD preliminary development plan is consistent with the Comprehensive Plan adopted by the City Council, meets requirements of chapter 33.106, and can be served by existing or proposed public facilities such as streets, water mains, sewer lines, public safety facilities and schools.

"(2) The proposed PUD preliminary development plan provides an effective and unified treatment of the subject site and addresses the objectives listed in 33.79.010.

"(3) The development standards listed in section 33.79.050 are met. * * *"

In addition, before approving any application for a conditional use permit, Code section 33.106 (*amended by* City Ordinance 155124, 1983) requires:

"* * * In permitting [conditional uses], it shall be determined that the use at the particular location is desirable to the public convenience and welfare and is not detrimental or injurious to the public health, peace or safety, or to the character and value of the surrounding properties.

"* * * * *"

In this case, the applicant's preliminary PUD plan and tentative subdivision plats were approved by the hearing officer subject to certain conditions. The city council adopted the hearing officer's findings and affirmed the approval of the preliminary plan and tentative plats. The conditions attached to the approval, set forth more fully in the margin,[4] generally

---

[4] The conditions are:

"A. Prior to final plat approval for any phase of the project, additional geotechnical studies, satisfactory to the Bureal of Buildings, shall be performed

require detailed geotechnical studies and reports verifying that particular building sites can be safely developed and that storm and groundwater runoff can be limited to predevelopment levels. The geotechnical studies and reports must meet with the approval of the Bureau of Buildings and the city engineer before final approval for any phase of the project can be given by the planning director.

██      Petitioners contend that the city's approval of the applicant's preliminary plan and tentative plats, subject to conditions, has resulted in a denial of the rights held applicable to such proceedings by *Fasano v. Washington Co. Comm.,* 264 Or 574, 507 P2d 23 (1973). They reason that conditions imposed by the city defer decisions on essential discretionary

---

within that phase. These studies shall be adequate to verify that all proposed roadways, drainageways and building sites can be safely developed. The report shall also differentiate between building lots that can be developed using conventional foundations (without need of additional geotechnical review) and lots that will require additional geotechnical consideration.

"B.  Additional final geotechnical reports shall specifically recommend suitable methods of stormwater and groundwater disposal, including the feasibility of groundwater recharge. The sources of stormwater and groundwater to be addressed shall include roof drains, foundation drains, springs and other subsurface drainage encountered during construction and runoff from public and private streets, walkways, parking lots, etc. The effect of the disposal methods on soil stability (landslides, erosion) shall be discussed. Underground disposal of stormwater (leach fields, seepage trenches, drywells and so forth) will not be permitted unless recommended in an approved geotechnical report.

"C.  The post-development release peak flow rate for any storm on the totally developed project site is to be restricted to no more than the pre-development runoff for that storm, up to the 100-year event. For instance, during a 10-year storm event, the post-development release flow rate can be no more than that for a 10-year storm with pre-development conditions. The release flow-rate criteria is to be applied and tested for the 5-, 10-, 25-, 50- and 100-year events. (This stage-type analysis will require the outlet structures to be of a multiple orifice, slot weir or some other sophisticated type. For the portions of this development within Washington County, it is assumed that Washington County's standard approach will be applied.) Roof drains and foundation drains may not be discharged on-site without the written approval of the Bureal of Buildings. If proposed, this method must be approved before design of the storm sewer system.

"D.  Operation and maintenance of the stormwater detention facilities will be the responsibility of the developers and/or homeowners' association. An operation and maintenance plan must be developed and approved by the City Engineer prior to the City's acceptance of the public drainage facilities.

"E.  Prior to approval of any final plans for this project, it shall be shown to the satisfaction of the Bureau of Buildings and the City Engineer that stormwater disposal for the entire development can be adequately handled. The feasibility of any dams or reservoirs necessary for the proposed disposal method shall be shown."

and quasi-judicial land use matters to a time when public participation is no longer possible. They also argue that the findings which were made are not supported by substantial evidence. LUBA concluded that the city made the findings required by its code[5] and that the approval process did not violate petitioner's rights under *Fasano.*

■ A two-stage approval process is a permissible way to make land use decisions such as the ones made here, so long as interested parties receive a full opportunity to be heard before the decision becomes final. *See, e.g., Golf Holding Co. v. McEachron,* 39 Or App 675, 678, 593 P2d 1202, *rev den* 287 Or 477 (1979); *Commonwealth Properties v. Washington County,* 35 Or App 387, 394-96, 582 P2d 1384 (1978); *Bienz v. City of Dayton,* 29 Or App 761, 764-770, 566 P2d 904, *rev den* 280 Or 171 (1977); *West v. City of Astoria,* 18 Or App 212, 220-222, 524 P2d 1216 (1974); ORS 92.040, 227.173 and 227.180.

■ Obviously, such an approval process could be used to deny interested parties the full opportunity to be heard if matters on which the public has a right to be heard are not decided until the second stage of the process—that is, the stage of the process in which final approval of the plan takes place and which occurs after public participation has come to an end. With this in mind, we understand this appeal to raise two questions: (1) Did the city address the issues on which petitioners had a right to be heard during the first stage of the approval process; and (2) are the city's findings on those issues supported by substantial evidence?

Petitioners' claim that the city failed to address the issues on which they were entitled to be heard is based on Code section 33.106, *supra.* In particular, the "critical and material land use issues" that petitioners claim were deferred

---

[5] For some reason, LUBA couched its discussion of this question in terms of whether or not the city found the preliminary plan proposed a "feasible" development project. Petitioners argue that "feasibility" cannot be the applicable standard because nearly any conceivable project may be feasible from an engineering perspective if enough money is committed to it. It is apparent, however, that by "feasibility" LUBA means more than feasibility from a technical engineering perspective. It means that substantial evidence supports findings that solutions to certain problems (for example, landslide potential) posed by a project are possible, likely and reasonably certain to succeed. *See Osborne v. Lane County,* 5 Or LUBA 172, 190 (1982); *Van Volkinburg v. Marion County Board of Commissioners,* 2 Or LUBA 112, 119-20 (1980). LUBA has held that findings on initial feasibility in this sense must be made at the PUD preliminary approval stage. *See Margulis v. Portland,* 4 Or LUBA 89, 98 (1981).

under the guise of conditions are: (1) whether all proposed roadways, drainage ways and all building sites can be safely developed; and (2) whether there are suitable methods of storm and groundwater disposal.

By order dated August 4, 1982, the city adopted findings of fact. It concluded that "the general standards for Conditional Use approval, as stated in Code section 33.106.010, have been met by this proposal and will continue to be met as the applicant complies with the conditions imposed below." That conclusion was supported by the following findings:

> "The public health, peace and safety will be protected because all responsible public agencies have had the opportunity to identify potential problems and seek solutions. The Bureau of Buildings geotechnical engineer recognizes that the site is in an area of severe landslide potential (as is virtually the entire west side of Portland). He finds, however, that the preliminary development plan is responsive to the limitations of the site and that construction is feasible on the portions of the site identified by the applicant (ridge tops and areas with slopes less than 30%).

> "He recommends conditions, which the hearing officer and the city council adopt, designed to positively assure safe development on and off-site, before any site work may commence.

> "Among these conditions are requirements for additional geotechnical studies to verify that individual building sites within each phase may be safely developed and for grading and building permits.

> "The Bureau of Sanitary Engineering and the Washington County Department of Public Works evaluated the issue of storm water management in the same manner. They conclude that use of the existing drainage channels and an expanded mill pond will be effective to retain runoff on the site. They recommend conditions which include evaluation of specific sources of storm water and groundwater (*e.g.,* roof and foundation drains, streets and their effect on soil stability), and limiting the postdevelopment peak flow rate for any storm to predevelopment runoff for that storm. These conditions will insure that the property does not generate additional storm water flows on properties adjacent to the project."

The above-quoted findings are supported by substantial evidence in the record, notably a detailed geotechnical

study of the area done in 1973, and extensive testimony by the city's experts. Petitioners appeared and were entitled to present evidence at the public hearings upon which the city's findings in this matter were based. It is apparent therefore that the city made the findings required by Code section 33.106[6] and that petitioners had a full opportunity to be heard on the critical land use issues before the city's decision became final. This is what *Fasano* requires.

Affirmed.

---

[6] It is true that the city council has not identified a precise solution for each and every potential problem posed by the PUD. Although the council must find that solutions are available, detailed technical matters involved in selecting a particular solution to each problem are left to be worked out between the applicant and city's experts during the second stage approval process for the final plan. *Fasano* does not require that technical discussion and review to proceed by way of public hearings.