Argued and submitted August 10, reversed and remanded on petition;
affirmed on cross-petition November 7, 2007

Annunziata GOULD,
*Petitioner*
*Cross-Respondent,*

*v.*

DESCHUTES COUNTY
and Central Oregon Irrigation District,
*Respondents,*

*and*

THORNBURGH RESORT COMPANY, LLC.,
*Respondent*
*Cross-Petitioner.*

Land Use Board of Appeals
2006100

Steve MUNSON,
*Petitioner below,*

*v.*

DESCHUTES COUNTY,
*Respondent below,*

*and*

THORNBURGH RESORT COMPANY, LLC;
and Central Oregon Irrigation District,
*Intervenors below.*

Land Use Board of Appeals
2006101; A135856

171 P3d 1017

Paul D. Dewey argued the cause and filed the briefs for petitioner - cross-respondent.

Elizabeth A. Dickson and Hurley Re & Gruetter PC filed the brief for respondent Central Oregon Irrigation District.

Peter Livingston argued the cause for respondent - cross-petitioner. With him on the brief was Schwabe, Williamson & Wyatt, P.C.

Laurie A. Craghead waived appearance for respondent Deschutes County.

Before Edmonds, Presiding Judge, and Brewer, Chief Judge, and Sercombe, Judge.

SERCOMBE, J.

**SERCOMBE, J.**

Petitioner Gould seeks review of an opinion and order of the Land Use Board of Appeals (LUBA). LUBA generally upheld a county decision to approve an application by respondent Thornburgh Resort Company, LLC (Thornburgh) for a conceptual master plan for a destination resort. However, LUBA remanded the county's decision for the adoption of additional findings and conditions to justify satisfaction of an approval standard on required overnight lodging accommodations. Gould pursues review in this court in order to obtain a more extensive remand to the county. Gould contends that LUBA erred in approving the county's adopted findings and conditions on the location of access roads for the development and on the necessary mitigation of the project's effects on fish and wildlife. Thornburgh cross-petitions for review of LUBA's characterization of the county's requirements for the size of the development lots. Because LUBA erred in its review of the county's determinations on mitigation of wildlife impacts, we reverse and remand. We otherwise affirm on Gould's remaining assignments of error and on the cross-petition for review.

Thornburgh applied to Deschutes County for approval of a conceptual master plan for a destination resort. The resort, to be located on about 1,970 acres of land west of the City of Redmond, is proposed to contain 1,425 dwelling units, including 425 units for overnight accommodations and a 50-room hotel. The resort plans also include three golf courses, two clubhouses, a community center, shops, and meeting and dining facilities. The resort property is bordered on three sides by land owned by the Bureau of Land Management. The land is zoned for exclusive farm use but designated "destination resort" in an overlay zone.

State and local law contain special standards for approving destination resort developments. ORS 197.435 to 197.467; OAR 660-015-0000(8) (Statewide Planning Goal 8 (Recreational Needs)); Deschutes County Code (DCC) Chapter 18.113. The county's development code requires a three-step approval process for a destination resort. The first step is consideration and approval of a "conceptual master plan" (CMP). DCC 18.113.040(A). The code sets out a number of

detailed requirements for an application for a CMP, DCC 18.113.050, as well as extensive approval standards for the plan, DCC 18.113.060 and DCC 18.113.070. An applicant for a CMP must submit evidence of compliance with those requirements at a public hearing. Any approval must be based on the record created at that hearing. DCC 18.113.040(A). Once the CMP is approved, it becomes the standard for staff evaluation of a "final master plan," the second step in the process. Any "substantial change" in the CMP must be reviewed and approved using the same process as the original plan approval. DCC 18.113.080. The third approval step for a destination resort is allowance of components or phases of the resort through site plan or land division approvals. DCC 18.113.040(C).

Following review of the proposed CMP by a local hearings officer, the board of county commissioners held hearings and approved the proposed CMP with conditions. The primary issue in this case concerns whether the county's adopted findings and conditions on the mitigation of the development's effects on fish and wildlife were sufficient to justify that approval.

The development code requires the CMP application to include a description of the wildlife resources of the site and the effect of the destination resort on those resources, the "methods employed to mitigate adverse impacts on the resources," and a "proposed resource protection plan to ensure that important natural features will be protected and maintained." DCC 18.113.050(B)(1). The approval criteria include a requirement that the decision-maker "find from substantial evidence in the record" that "[a]ny negative impact on fish and wildlife resources will be completely mitigated so that there is no net loss or net degradation of the resource." DCC 18.113.070(D).

The county's findings on the submission requirements of DCC 18.113.050(B)(1) with respect to wildlife note the preparation of a "Habitat Evaluation Procedures" analysis for the site that described "project impacts and corresponding mitigation measures." The findings list the types of wildlife on the site and the short-term and long-term impacts

on wildlife and fish by the proposed development. The explanation concludes:

"According to Tetra Tech [respondent's consultant], approximately 2,149 off-site acres will be needed to offset loss of habitat values on the subject property by virtue of the proposed development. * * * As discussed under DCC 18.113.070 M., the BLM MOU [(Bureau of Land Management memorandum of understanding)] requires [Thornburgh] to complete a wildlife mitigation plan. [Thornburgh] and BLM are currently evaluating the viability of implementing the agreed mitigation measures on federal property in the vicinity of the resort that is commonly known as the 'Masten Allotment.' "

The findings on compliance of the plan with the DCC 18.113.070(D) "no net loss" requirement conclude:

"The HEP analysis will be used to guide mitigation activities. Due to the size and scope of the project and the related impact from cessation of some cattle-grazing activities, [Thornburgh] is participating with a multi-agency group to finalize the mitigation area. This includes representatives of ODFW [(Oregon Department of Fish and Wildlife)], BLM, Tetra Tech and [Thornburgh].

"* * * * *

"In a letter to the County dated February 9, 2005, Steven George, Deschutes District Wildlife Biologist with ODFW, states that ODFW is working with [Thornburgh] to develop an acceptable wildlife report with mitigation measures and expresses the view that '[Thornburgh] will be able to develop an acceptable program to mitigate the impacts.' * * *

"* * * * *

"The Board finds that, as stated by ODFW, it is feasible to mitigate completely any negative impact on identified fish and wildlife resources so that there is no net loss or net degradation of the resource. The MOU between the BLM and [Thornburgh] requires [Thornburgh] to complete a wildlife mitigation plan that will be reviewed and approved by both ODFW and BLM. * * * The Board imposes as a condition below that the mitigation plan adopted by [Thornburgh] in consultation with Tetra Tech, ODFW and

the BLM be adopted and implemented throughout the life of the resort."

In addressing a related requirement that the "resort mitigate any demands that it creates on publicly-owned recreational facilities on public lands in the surrounding area," the county decision details the content of the Bureau of Land Management (BLM) memorandum of understanding (MOU):

"In Section II.7 of the MOU, [Thornburgh] and BLM agree to work cooperatively to complete a wildlife mitigation plan to compensate for impacts related to the resort. The MOU outlines specific mitigation measures to be undertaken by [Thornburgh] to mitigate the impacts of resort development on surrounding federal recreation facilities. * * * [The] BLM identified federal property located to the south and east (commonly known as the 'Masten Allotment') as an area to be managed with an emphasis on the preservation and enhancement of wildlife habitat. [Thornburgh], BLM and ODFW are working together to evaluate whether [Thornburgh's] wildlife mitigation obligation can be implemented in this location. * * *

"The record contains a report * * * from Tetra Tech, which describes habitat, land uses and mitigation measures to be implemented on the federal lands surrounding the resort. The Tetra Tech report, the BLM MOU and the AAC Agricultural Assessment identify surrounding land uses and potential conflicts between the resort and adjacent uses within 600 feet. The data, analysis and mitigation measures contained in the Tetra Tech report have been incorporated into the final MOU between [Thornburgh] and BLM."

Consistently with those findings, the county approved the conceptual master plan conditionally, requiring among other things that

"[Thornburgh] shall abide at all times with the MOU with BLM, dated September 28, 2005, regarding mitigation of impacts on surrounding federal lands, to include wildlife mitigation and long-range trail planning and construction of a public trail system. The mitigation plan adopted by [Thornburgh] in consultation with Tetra Tech, ODFW and the BLM shall be adopted and implemented throughout the life of the resort."

The memorandum of understanding requires Thornburgh to complete a wildlife impact mitigation plan that "will specify mitigation measures that are sufficient to insure that there is no net loss of wildlife habitat values as a result of the proposed development." The agreement requires approval of the plan by ODFW and BLM and commits Thornburgh to "work cooperatively with ODFW and BLM to determine the specific locations where the mitigation plan will be implemented." The agreement provides that certain mitigation measures may be undertaken within the Masten Allotment, and those measures "may include" trail construction, removal of old trails, fencing, vegetation thinning and management, and noxious weed controls.

Gould sought review of the county's land use decision by LUBA. Gould's petition for review set out 13 assignments of error by the county. Gould's eleventh assignment of error to LUBA claimed that the county "applied inappropriate legal standards and failed to make proper findings based on substantial evidence in determining that fish and wildlife protection criteria are met." Gould asserted that the county's findings on the feasibility of complying with the fish and wildlife protection criteria were not supported by substantial evidence and that the "deferral of compliance with a criterion and reliance on an agency to decide compliance with the [c]ounty's requirements is not permissible."

LUBA determined that the local government record contained substantial evidence to support the county's findings on compliance with DCC 18.113.070(D). It concluded:

"Where the county finds that it is feasible to satisfy a mandatory approval criterion, as the county did here with regard to DCC 18.113.070(D), the question is whether that finding is adequate and supported by substantial evidence. *Salo v. City of Oregon City*, 36 Or LUBA 415, 425 (1999). Here, Thornburgh supplied the Wildlife Report to identify the negative impacts on fish and wildlife that can be expected in developing Thornburgh resort. The report also describes how Thornburgh proposes to go about mitigating that damage, both on-site and off-site. In response to comments directed at that report, Thornburgh has entered into discussions with ODFW and a MOU with the BLM to refine that proposal and come up with better solutions to ensure

that expected damage is completely mitigated. ODFW and BLM have both indicated that they believe such solutions are possible and likely to succeed. We conclude that the county's finding regarding DCC 18.113.070(D) is supported by substantial evidence and is adequate to explain how Thornburgh Resort will comply with DCC 18.113.070(D).

"Had Thornburgh not submitted the Wildlife Report, we likely would have agreed with petitioners that a county finding that it is feasible to comply with DCC 18.113.070(D) would likely not be supported by substantial evidence. Even though ODFW and BLM have considerable expertise on how to mitigate damage to fish and wildlife, bare assurances from ODFW and BLM that solutions are out there would likely not be the kind of evidence a reasonable person would rely on to find that the damage that Thornburgh resort will do to fish and wildlife habitat can be completely mitigated. But with that report, the dialogue that has already occurred between Thornburgh, ODFW and BLM, the MOU that provides further direction regarding future refinements to ensure complete mitigation, and the optimism expressed by the agencies involved, we believe a reasonable person could find that it is feasible to comply with DCC 18.13.070(D)."

On review, Gould complains that LUBA erred "in determining that the County's findings and evidence concerning feasibility of mitigation for the project's negative impacts on fish and wildlife satisfy the applicable approval standard."[1] Gould contends that the approval standard was not met because there was insufficient evidence in the record to show that any particular wildlife impact mitigation plan was feasible and that LUBA erred in not requiring the county to specify a particular mitigation plan and subject that plan to public notice and county hearing processes. Respondents[2] counter that our standard of review is whether LUBA correctly applied the "substantial evidence" test in reviewing the findings that a wildlife impact mitigation plan is "feasible."

---

[1] Gould raises two other assignments of error. Gould contends that LUBA erred in upholding the county's approval of destination resort roads not located on land zoned for destination resorts and in concluding that there was no need for an exception to Goal 3 in order to locate access roads to the resort on land zoned for exclusive farm uses. We affirm as to those assignments of error without discussion.

[2] Respondents, as used herein, refers to Central Oregon Irrigation District and Thornburgh Resort Company, LLC.

According to respondents, LUBA properly applied the substantial evidence test. Alternatively, respondents further claim that public review of the feasibility of a mitigation plan was sufficient, the county's imposed condition was adequate and specific enough to assure compliance with the approval standard, and the county did not improperly delegate the issue of compliance with an approval standard to another agency.

The issue, then, is whether LUBA erred in affirming the county's findings that the conceptual master plan application complied with DCC 18.113.070(D) because an acceptable mitigation plan was feasible and likely to be adopted by BLM, ODFW, and Thornburgh. The relevant standard of review of LUBA's determination on the adequacy of the county's conclusion of compliance with DCC 18.113.070(D) is whether LUBA's determination is "unlawful in substance." ORS 197.850(9)(a).

LUBA's opinion and order was unlawful in substance for the reasons that follow. First, the county's findings were inadequate to establish the necessary and likely content of any wildlife impact mitigation plan. Without knowing the specifics of any required mitigation measures, there can be no effective evaluation of whether the project's effects on fish and wildlife resources will be "completely mitigated" as required by DCC 18.113.070(D). ORS 215.416(9) requires that the county's decision approving the CMP explain "the justification for the decision based on the criteria, standards and facts set forth" in the decision.[3] The county's decision is inconsistent with ORS 215.416(9) because the decision lacks a sufficient description of the wildlife impact mitigation plan, and justification of that plan based on the standards in DCC 18.113.070(D). Second, that code provision requires that the

[3] ORS 215.416 states the process and justification for the discretionary approval by a county of a proposed development of land. ORS 215.416(9) provides:

"Approval or denial of a permit * * * shall be based upon and accompanied by a brief statement that explains the criteria and standards considered relevant to the decision, states the facts relied upon in rendering the decision and explains the justification for the decision based on the criteria, standards and facts set forth."

That requirement is echoed in the county ordinance on land use hearing procedures. DCC 22.28.010.

content of the mitigation plan be based on "substantial evidence in the record," not evidence outside the CMP record. In this case, the particulars of the mitigation plan were to be based on a future negotiation, and not a county hearing process. Because LUBA's opinion and order concluded that the county's justification was adequate despite those deficiencies, the board's decision was "unlawful in substance."

Nevertheless, relying in part on *Meyer v. City of Portland*, 67 Or App 274, 678 P2d 741, *rev den*, 297 Or 82 (1984), Thornburgh argues that the finding of feasibility, together with the condition requiring adoption of a mitigation plan, is sufficient to prove that the CMP complies with DCC 18.113.070(D). In *Meyer*, we determined that the public participatory rights in a land use hearing on a residential subdivision, then required by *Fasano v. Washington Co. Comm.*, 264 Or 574, 507 P2d 23 (1973), were not undercut by conditioning final administrative approval of the subdivision on further technical studies on the individual building sites. That was because the evidentiary record of the subdivision hearing was sufficient to support findings that the approval standards were met, and the results of the technical studies were not necessary to reach that conclusion. We held:

> "The above-quoted findings are supported by substantial evidence in the record, notably a detailed geotechnical study of the area done in 1973, and extensive testimony by the city's experts. Petitioners appeared and were entitled to present evidence at the public hearings upon which the city's findings in this matter were based. It is apparent therefore that the city made the findings required by Code section 33.106 and that petitioners had a full opportunity to be heard on the critical land use issues before the city's decision became final."

*Meyer*, 67 Or App at 281-82 (footnote omitted).

In reaching that conclusion, we noted that LUBA affirmed the city subdivision approval because the city found the land division to be "feasible." However, we observed that LUBA's use of a "feasibility" standard in determining whether the approval standards were met was misleading:

"For some reason, LUBA couched its discussion of this question in terms of whether or not the city found the preliminary plan proposed a 'feasible' development project. Petitioners argue that 'feasibility' cannot be the applicable standard because nearly any conceivable project may be feasible from an engineering perspective if enough money is committed to it. It is apparent, however, that by 'feasibility' LUBA means more than feasibility from a technical engineering perspective. It means that substantial evidence supports findings that solutions to certain problems (for example, landslide potential) posed by a project are possible, likely and reasonably certain to succeed."

*Id.* at 280 n 5 (citations omitted).

Thus, *Meyer* instructs that a proposed land development plan must be specific and certain enough to support findings that the proposal satisfies the applicable approval criteria. If the nature of the development is uncertain, either by omission or because its composition or design is subject to future study and determination, and that uncertainty precludes a necessary conclusion of consistency with the decisional standards, the application should be denied or made more certain by appropriate conditions of approval. Another option is to postpone the decision. As suggested in *Meyer*, however,

"[a] two-stage approval process is a permissible way to make land use decisions such as the ones made here, so long as interested parties receive a full opportunity to be heard before the decision becomes final.

"Obviously, such an approval process could be used to deny interested parties the full opportunity to be heard if matters on which the public has a right to be heard are not decided until the second stage of the process—that is, the stage of the process in which final approval of the plan takes place and which occurs after public participation has come to an end."

*Id.* at 280 (citations omitted); *see also Paterson v. City of Bend*, 201 Or App 344, 349, 118 P3d 842 (2005) ("In principle, we agree that nothing in the development code precludes the city from, in effect, postponing a showing of compliance with specific development criteria until the final plat approval, provided there is a showing that compliance is feasible.").

In this case, the county's decision did not postpone a determination that the project complies with DCC 18.113.070(D). The county might have, but did not, postpone determination of compliance with that standard until the final master plan approval step and infuse that process with the same participatory rights as those allowed in the CMP approval hearing.[4] Instead, the county implicitly concluded (but did not directly find) that the nature of the wildlife impact mitigation plan was sufficiently certain and probable to allow a present determination of consistency with the approval criterion. LUBA found that the findings were "adequate" to explain compliance with DCC 18.113.070(D).

But the governing ordinance requires a *Meyer* determination of whether "solutions to certain problems * * * are * * * likely and reasonably certain to succeed"—whether the findings and conditions of the conceptual master plan approval adequately support the conclusion that "any negative impact on fish and wildlife resources will be completely mitigated so that there is no net loss or net degradation of the resource" as required by DCC 18.113.070(D). The adopted findings fail to make that case.

The wildlife impact mitigation plan was not yet composed. Although Thornburgh's consultant proposed a number of offsite mitigation measures on federal land, the BLM reported that these measures needed "clarification and further development." In particular, the agency asked that the effect of the development on deer and elk winter range and habitats along a nearby river be clarified. It noted that "[i]t is unclear what types of habitat conditions the resort intends to provide on-site compared to off-site." The BLM concluded that "[s]everal items included in the draft report would not be considered appropriate off-site mitigation," including removal of grazing on the resort property and from offsite mitigation areas, placing rocks on offsite mitigation areas, creation of new water sources for wildlife, and closure of

---

[4] In the context of this case, a determination that a wildlife impact mitigation plan is "feasible" might be appropriate to justify postponement of any evaluation of the application of DCC 18.113.070(D) to the plan. The determination of feasibility, however, is not an adequate substitute for an assessment of whether a specific mitigation plan actually complies with the standard.

existing roads and trails. Thus, the particular nature of the wildlife impact mitigation plan was not known at the time of the CMP hearing.

The county development code requires that the conceptual master plan application include the "methods employed to mitigate adverse impacts on [wildlife] resources." DCC 18.113.050(B)(1). That requirement allows little speculation. The code mandates that the applicant submit a "proposed [wildlife] resource protection plan." That requires that the submitted plan be specific enough to apply the approval standards in a meaningful way. The code requirements set out the necessary foundation for a determination that "[a]*ny* negative impact on fish and wildlife resources will be *completely mitigated* so that there is no net loss or net degradation of the resource." DCC 18.113.070(D) (emphases added). The county's substitute of an uncertain plan, a plan yet to be composed, violates those requirements.

The county decision was also defective for a second reason. The code mandates that the approval standards be evaluated "from substantial evidence in the record." DCC 18.113.070(D). That provision requires that the justification be based on evidence submitted at public hearings on the application. The county's decision, however, allows the mitigation plan justification to be established by future discussions among Thornburgh, ODFW, and BLM, and not on evidence submitted during the public hearings. That robs interested persons of the participatory rights allowed by the county ordinance.

In sum, the county's conclusion that DCC 18.113.070(D) is satisfied by a potential mitigation plan is legally insufficient to explain the justification for the decision under ORS 215.419(9). For that reason, LUBA's decision upholding that conclusion is unlawful in substance.

Thornburgh cross-petitions, challenging LUBA's comments in its decision on the effect of the approved residential lot standards. DCC 18.113.060(G)(1) requires a CMP to contain standards for the "minimum lot area, width, lot coverage, frontage and yard requirements and building heights" as well as any solar access for structures within the

resort. The last sentence of DCC 18.113.060(G)(1) concludes that "[n]o lot for a single-family residence shall exceed an overall project average of 22,000 square feet in size."

■        Thornburgh submitted numeric standards for minimum lot areas, lot width averages, lot frontages, lot coverages, lot setbacks, and building heights for eight different types of lots, with the largest lot type being a minimum of 15,000 square feet in area ("Type A") and the smallest lot type being at least 3,200 square feet in area ("Type H"). The county determined that

"[t]he [board of county commissioners] finds that additional flexibility may be needed to accommodate the planned range of living units and services. For example, a lot size in excess of one acre may be necessary for a home site in some cases, particularly if it is desirable to preserve rocky or unique terrain. A 1,500-square-foot lot may be appropriate for condominiums or row houses surrounded by common area."

Before LUBA, Gould contended that this finding allowed lots that exceeded the 22,000 square feet maximum prescribed by DCC 18.113.060(G)(1). After quoting the county finding, LUBA stated:

"Thornburgh argues, and we agree, that the final sentence of DCC 18.113.060(G)(1) is 'inartfully worded.' That sentence does not impose a maximum lot size of 22,000 square feet; it prohibits lot sizes that would result in the 'overall project average' exceeding 22,000 square feet. However, to the extent the above quoted findings can be read to grant Thornburgh the 'flexibility' to propose one acre or 1,500 square foot lots, even though the approved lot dimensions at Record 5642 would not permit lots that large or small, we do not believe that grant of flexibility is within the county's discretion under DCC 18.133.060(G)(1). If Thornburgh can subdivide the property into whatever size lots it believes the terrain or high density housing type it desires might warrant, without first amending the CMP to allow such different lot sizes, the exercise required by DCC 18.113.060(G)(1) is a waste of time at best."

On review, Thornburgh contends that LUBA misread the lot standards to limit "lots that large." Thornburgh points out that the development code and the submission set

*minimum* parcel sizes and do not require the adoption of *maximum* lot areas. Thus, the approved residential lot area standards would not allow a lot less than 3,200 square feet in area, but would allow any lot of that size or larger in area. LUBA's conclusion, however, rested on the application of the "approved lot dimension" standard, which for lots of 15,000 square feet or more in area required a "lot width average" of 100 feet. The application of that standard to all of the lots within the "Type A" category may operate to limit the sizes of some of the lots. LUBA did not err in reaching that conclusion, although it was not necessary to the determination of Gould's precise assignment of error to LUBA.

Reversed and remanded on petition; affirmed on cross-petition.