Argued and submitted December 1, 2009, affirmed on petition and cross-petition
February 24, 2010

Annunziata GOULD,
*Petitioner
Cross-Respondent,*

*v.*

DESCHUTES COUNTY,
*Respondent,*

*and*

THORNBURGH RESORT COMPANY, LLC,
*Respondent
Cross-Petitioner.*

Land Use Board of Appeals
2008203; A143430

227 P3d 758

Paul D. Dewey argued the cause and filed the briefs for petitioner - cross-respondent.

Peter Livingston argued the cause for respondent - cross-petitioner. With him on the brief was Schwabe, Williamson & Wyatt, PC.

No appearance for respondent Deschutes County.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

ORTEGA, J.

**ORTEGA, J.**

This petition and cross-petition for judicial review arise from a Land Use Board of Appeals (LUBA) decision that remanded Deschutes County's approval of the final master plan (FMP) for development of a destination resort by Thornburgh Resort Company, LLC (Thornburgh). The issues on review concern Thornburgh's fish and wildlife mitigation plans. Petitioner Gould argues that LUBA remanded too little to the county. On a cross-petition, Thornburgh contends that LUBA remanded too much. We affirm on the petition and the cross-petition.

This is but the latest appeal of several regarding Thornburgh's development of a destination resort. For context, we begin with a brief procedural history.

After the county approved Thornburgh's conceptual master plan (CMP), Gould appealed to LUBA, which remanded for additional findings. *Gould v. Deschutes County*, 54 Or LUBA 205 (2007) (*Gould I*). Gould sought a more extensive remand from this court, and we concluded that LUBA had erred in its review of the county's determinations regarding wildlife mitigation. *Gould v. Deschutes County*, 216 Or App 150, 171 P3d 1017 (2007) (*Gould II*).

On remand, the county approved Thornburgh's CMP with further findings and new conditions of approval; it postponed determination of the consistency of the CMP with its wildlife mitigation standards until a later public hearing. Gould again appealed to LUBA, and LUBA affirmed. *Gould v. Deschutes County*, 57 Or LUBA 403 (2008) (*Gould III*). Gould sought judicial review, and we affirmed. *Gould v. Deschutes County*, 227 Or App 601, 206 P3d 1106, *rev den*, 347 Or 258 (2009) (*Gould IV*).

Meanwhile, Thornburgh developed its fish and wildlife mitigation plan and pursued approval of its FMP. We take the description of Thornburgh's mitigation plan from the LUBA order and from the record.

Thornburgh's wildlife management plan contains two components. The first addresses terrestrial wildlife and is described in the "Thornburgh Resort LLC Wildlife Mitigation Plan for Thornburgh Resort" ("Terrestrial WMP") and the

"Off-Site Habitat Mitigation and Monitoring Plan for the Thornburgh Destination Resort Project," dated August 2008 ("M&M Plan"). The second component addresses off-site fish habitat and is described in the "Thornburgh Resort Fish and Wildlife Mitigation Plan Addendum Relating to Potential Impacts of Ground Water Withdrawals on Fish Habitat" ("Fish WMP") and an August 11, 2008, letter proposing additional mitigation for Whychus Creek.[1] LUBA explained:

> "It is undisputed that development of the proposed destination resort will destroy or damage some existing terrestrial wildlife habitat, making that existing terrestrial habitat unavailable for wildlife or less suitable for wildlife. Thornburgh proposes to mitigate for that loss in two ways, on-site mitigation and off-site mitigation. The on-site mitigation will reduce the amount of habitat loss that would otherwise result from construction of the destination resort; the off-site mitigation is to compensate for the habitat loss that cannot be avoided when the destination resort is constructed. * * * The Terrestrial WMP explains how Thornburgh went about assessing how much mitigation will be required:

>> " 'ODFW [the Oregon Department of Fish and Wildlife] suggested a habitat modeling approach that uses a modification of the U.S. Fish and Wildlife Service's (1981) Habitat Evaluation Procedures (HEP) analysis. This describes existing habitat values and estimates impacts. HEP is an accounting method, in which the value of each habitat type for each of a series of evaluation species is expressed in terms of habitat units (HUs). These are calculated as the number of acres of that habitat multiplied by an index of its quality, and expressed as a number between 0 and 1, which is termed the Habitat Suitability Index (HSI). One HU is the equivalent of one acre of the best habitat available for a species. Two acres of

---

[1] The letter is captioned "Clarification/Modification of Addendum to Fish and Wildlife Mitigation Plan Relating to Potential Impacts of Ground Water Withdrawals on Fish Habitat." It contains two sections, the first of which states that Thornburgh had earlier indicated its willingness to remove a second dam on Deep Canyon Creek "as part of its Fish and Wildlife Mitigation Plan. This letter confirms that intention and so modifies the Addendum." The second section states that Thornburgh believed its mitigation efforts were sufficient, but that Thornburgh could, if necessary, provide additional flow of 106 acre-feet per year in Whychus Creek by participating in a conservation project with the Three Sisters Irrigation District.

habitat half as good would also equal one HU, and so on. In the HEP analysis, to make the process manageable, an "evaluation species" is chosen to represent a number of species with similar lifestyles and habitat requirements (USFWS 1980, 1981).' "

According to the Terrestrial WMP, Thornburgh's off-site mitigation would be 8,474 HUs. The Terrestrial WMP provides:

"[Thornburgh] shall restore and enhance approximately 4,501 acres of juniper woodlands on public lands administered by the BLM [Bureau of Land Management] in the Cline Buttes Sub-Area to mitigate the loss of 8,474 HUs. The specific areas subject to specific rehabilitation or enhancement actions will be determined through consultation by BLM, [Thornburgh], and ODFW resource management specialists, based upon the current conditions of the mitigation site and the agreed amount and type of enhancement. [Thornburgh] shall maintain rehabilitated areas through ongoing efforts as needed, such as reduction of weeds, thinning of junipers, and reclosing unwanted travel routes. BLM will manage public land on which this mitigation will be implemented, to comply with BLM's rangeland health standards to maintain desirable habitat for wildlife."

The M&M Plan, which was developed in coordination with the BLM, further explains how off-site mitigation will be implemented. Because the BLM had not finalized the Cline Buttes Recreation Area Plan (CBRAP), the exact location of the mitigation efforts could not be identified. The mitigation methods used in the M&M Plan, however, were structured to be applicable to any parcel of land in the Cline Buttes Recreation Area that the BLM, after finalizing the CBRAP, determined to be suitable for mitigation. The mitigation methods include weed management, vegetation enhancement, reduction of unauthorized off-road motor vehicle use, creation of wildlife water sources, and traffic speed monitoring devices. Thornburgh plans to use an adaptive approach to vegetation management, in which the management efforts are monitored and may be changed to better meet desired goals.

Thornburgh also proposed, as what it calls "an ultimate backstop, in order to eliminate the remote possibility that the BLM land would somehow become unavailable," to fund mitigation elsewhere in Deschutes County. As the hearings officer noted, that contingent proposal involved a dedicated fund for use by ODFW.

After a public hearing, a county hearings officer approved the FMP with conditions. In proceedings before the county, as on appeal, significant portions of the argument focused on Deschutes County Code (DCC) 18.113.070(D), sometimes referred to as the "no net loss" standard, which provides:

> "In order to approve a destination resort, the Planning Director or Hearings Body shall find from substantial evidence in the record that:
>
> "* * * * *
>
> "D. Any negative impact on fish and wildlife resources will be completely mitigated so that there is no net loss or net degradation of the resource."

The hearings officer concluded that, although the standard is difficult to quantify, it "requires an analysis of species on the site, the likely impacts of development, and the applicant's plan to address those impacts. It does not require that each species be maintained or replaced with an equivalent species on a 1:1 or better ratio." The hearings officer went on to agree with Thornburgh's argument that "the modified HEP analysis adequately quantifies the impacts and provides a workable methodology to compensate for the impact" and decided that Thornburgh had demonstrated that the mitigation plan was reasonably likely to succeed. The hearings officer concluded that Thornburgh's mitigation plan "is adequate to ensure that the impact of the development on fish and wildlife habitats results in no net loss."

After the board of county commissioners declined to hear Gould's appeal, Gould appealed to LUBA. LUBA rejected her challenges to the hearings officer's construction of DCC 18.113.070(D); sustained her challenge to the adequacy of the Terrestrial WMP and M&M Plan under *Gould II*; sustained her challenge to the sufficiency of the hearings

officer's findings regarding the efficacy of mitigation of thermal impacts on Whychus Creek; rejected her challenges to the sufficiency of the findings regarding fish mitigation; and rejected her challenge to the sufficiency of the evidence concerning "cool patches" in the Deschutes River basin.

Gould petitioned for judicial review. She asserts three assignments of error, contending that LUBA's order is unlawful in substance because (1) LUBA misinterpreted DCC 18.113.070(D); (2) LUBA erroneously determined that the conditions of approval are sufficient to identify and require fish mitigation; and (3) LUBA erred in determining that the hearings officer's findings regarding mitigation of fish resources were adequate. Thornburgh cross-petitioned, arguing that LUBA erred by concluding that Thornburgh's mitigation plan was not specific enough to satisfy the standard described by this court in *Gould II*.

We review to determine whether LUBA's order was "unlawful in substance or procedure." ORS 197.850(9)(a). In interpreting the county code, we give no deference to the interpretation made by the hearings officer or by LUBA. *Gage v. City of Portland*, 319 Or 308, 315-17, 877 P2d 1187 (1994) (*Gage I*); *Gage v. City of Portland*, 133 Or App 346, 349-50, 891 P2d 1331 (1995) (*Gage II*). In reviewing LUBA's determination of substantial evidence,

> "[o]ur task is not to assess whether the local government erred in making a finding, but to determine whether LUBA properly exercised its review authority. Thus, we do not substitute our judgment for LUBA's on whether a reasonable person could make a finding of fact based upon the entire local government record. Instead, we evaluate whether LUBA properly stated and applied its own standard of review. If LUBA does not err in the articulation of its substantial evidence standard of review under ORS 197.835(9)(a)(C), we would reverse LUBA's decision only when there is no evidence to support the finding or if the evidence in the case is 'so at odds with LUBA's evaluation that a reviewing court could infer that LUBA had misunderstood or misapplied its scope of review.' *Younger* [*v. City of Portland*, 305 Or 346, 359, 752 P2d 262 (1988)]."

*Citizens for Responsibility v. Lane County*, 218 Or App 339, 345, 180 P3d 35 (2008).

## I. GOULD'S FIRST ASSIGNMENT OF ERROR

◼ In her first assignment of error, Gould contends that LUBA's order "is unlawful in substance because it incorrectly determined without substantial evidence that the hearings officer's finding of compliance with the DCC 'no net loss' standard for fish and wildlife mitigation did not impermissibly involve substitution of species and maintenance/replacement of species at less than a 1:1 ratio." Before LUBA, Gould argued that DCC 18.113.070(D) could not be satisfied by simply improving habitat, that mitigation must be directed toward the species affected by the proposed development, and that mitigation cannot result in less than a 1:1 replacement ratio. LUBA rejected those arguments, reasoning that there was "nothing inherently improper about employing [an HEP] analysis to simplify the potentially exceedingly complicated task of assessing how much damage the proposed destination resort would cause to the wildlife resource and how much mitigation should be required to ensure there is no net loss to that wildlife resource."[2] LUBA further concluded that Gould's

> "challenge to the county's focus on wildlife *habitat* rather than the wildlife itself, while a literally plausible criticism based on the words of DCC 18.113.070(D), ignores the reality of wildlife resource protection. Development rarely if ever is carried out in a way that purposefully causes harm to the wildlife that may actually be present on a development site. The wildlife typically is gone before construction equipment shows up. The harm is caused by altering or destroying the habitat that the wildlife requires for continued existence, so that the habitat is no longer available for the wildlife to use or is less suitable for wildlife use. The county's focus on wildlife habitat does not constitute error."

(Emphasis in original.)

---

[2] LUBA observed that a loss in habitat that is currently occupied by threatened or endangered species likely could not be mitigated by improving off-site habitat suitable for some other species, but it noted that there are no threatened or endangered species on the property. We understand LUBA's observation as a reference to other legal requirements for protection of threatened or endangered species. *See, e.g.*, ORS 197.460(1) (requiring counties considering destination resorts to ensure that "[i]mportant natural features, including habitat of threatened or endangered species, streams, rivers and significant wetlands shall be retained"); DCC 23.84.020 (setting a goal to provide for destination resort development, *inter alia*, "in a manner that will maintain important natural features, such as habitat of threatened or endangered species, streams, rivers and significant wetlands").

On review, Gould's arguments in support of her first assignment of error shift between issues of legal interpretation and issues of substantial evidence. She contends that, as a matter of law, DCC 18.113.070(D) requires the prevention of *any* loss of any species. At the same time, however, she acknowledges that she has not argued that DCC 18.113.070(D) requires "studying every wildlife species" but rather has argued that a longer, on-the-ground survey was required as a basis for mitigation.

At oral argument, Gould stated that she did not contend that a mitigation plan must catalog the numbers of each species present on the land before development—by counting, for example, the exact number of crickets on the land—and mitigate by providing for equal numbers after development. When asked what DCC 18.113.070(D) requires, as a matter of code interpretation, Gould suggested that the legal principle depends on the evidence of species surveys and that, if an opponent of the development can identify a species for which complete mitigation is not provided, then a question of legal interpretation arises.

We thus understand Gould's argument to be twofold: (1) that, as a legal matter, DCC 18.113.070(D) requires that the development of a destination resort cause no loss of numbers of any species identified as having been affected by the development—that is, that the mitigation plan must maintain or replace those species at a 1:1 ratio; and (2) that, as a factual matter, Thornburgh's plan does not meet that standard.

We begin with the code interpretation issue. As noted above, DCC 18.113.070(D) requires substantial evidence that "[a]ny negative impact on fish and wildlife resources will be completely mitigated so that there is no net loss or net degradation of the resource." The parties seem to agree that DCC 18.113.070(D) requires, first, an assessment of fish and wildlife resources before development and, second, mitigation to make up for negative impacts caused by development. Although the parties do not frame the issue this way, the heart of their dispute appears to be a disagreement about what the county meant by "fish and wildlife resources"

—that is, what exactly the county requires to be "completely mitigated so that there is no net loss or net degradation."

The meaning of "fish and wildlife resources" is not immediately clear, and resort to a dictionary is of limited assistance.[3] Other provisions of the county code, however, provide some guidance. That context suggests that "fish and wildlife resources" are not identical to fish and wildlife *species*. For example, among provisions of the county's comprehensive plan that address fish and wildlife, DCC 23.104.020 states the following goals:

"1. To conserve and protect existing fish and wildlife areas.

"2. To maintain all species at optimum levels to prevent serious depletion of indigenous species.

"3. To develop and manage the lands and waters of this County in a manner that will enhance, where possible, the production and public enjoyment of wildlife.

"4. To develop and maintain public access to lands and waters and the wildlife resources thereon.

"5. To maintain wildlife diversity and habitats that support the wildlife diversity in the County."

The varying word choices—with references to "fish and wildlife areas," "species," "wildlife," and "wildlife resources"— suggest that the phrase "wildlife resources" is not identical to "wildlife" or "species."

Consistently with that view, DCC 23.104.010 provides, in part:

"It is recognized that *failure to protect fish and wildlife resources will result in loss of habitat and loss of endangered species*, declining tourist expenditures, loss of recreational opportunities and loss of quality of life. Already, Deschutes County has witnessed the serious degrading of the cold-water fishery by irrigation withdrawals, loss of sensitive deer winter rangelands to development and the

---

[3] A common meaning of the adjective "net" (as in "no net loss or net degradation of the resource") is "free from all charges or deductions: as **a** : remaining after the deduction of all charges, outlay, or loss ‹ earnings› ‹ proceeds›—opposed to *gross*." *Webster's Third New Int'l Dictionary* 1519 (unabridged ed 2002).

disturbance of deer migration corridors due to residential and recreational construction.

"* * * * *

"Throughout committee discussions and public testimony, the public expressed concern that local fish and wildlife resources be protected. * * * During periodic review the County also updated the fish and wildlife inventories and completed Economic, Social, Environmental and Energy analysis of conflicting uses and developed programs *to protect the significant Goal 5 wildlife resources.*"

(Emphasis added.) Thus, the county associated damage to "fish and wildlife resources" with "loss of habitat and loss of endangered species," which suggests that the resources concerns are closely related to habitat concerns.

The county also associated protection of "fish and wildlife resources" with protection of "significant Goal 5 wildlife resources." Goal 5 associates the protection of "resources" with habitat:

"Local governments shall adopt programs that will protect natural resources and conserve scenic, historic, and open space resources for present and future generations. These resources promote a healthy environment and natural landscape that contributes to Oregon's livability.

"The following *resources* shall be inventoried:

"a.   Riparian corridors, including water and riparian areas and *fish habitat*;

"* * * * *

"c.   *Wildlife Habitat*[.]"

(Emphasis added.) Goal 5 thus treats fish and wildlife habitat as "resources."

Thus, the context of DCC 18.113.070(D) strongly suggests that "fish and wildlife resources" refers not to species of fish and wildlife, but to the habitat that supports fish and wildlife. In light of that context, we conclude that DCC 18.113.070(D) allows a focus on fish and wildlife habitat to establish that "[a]ny negative impact on fish and wildlife resources will be completely mitigated so that there is no net loss or net degradation of the resource." That standard may

be satisfied by a plan that will completely mitigate any negative impact on the habitat that supports fish and wildlife, without showing that each individual species will be maintained or replaced on a one-to-one basis. LUBA did not err by rejecting Gould's contrary interpretation of DCC 18.113.070(D).

We turn to Gould's arguments concerning substantial evidence. We understand those arguments to depend, in large part, on her interpretation of DCC 18.113.070(D). In any event, Gould makes no persuasive argument that LUBA erred in its substantial evidence review of the hearings officer's findings. Accordingly, LUBA's order is not unlawful in substance as Gould contends in her first assignment of error.

## II. GOULD'S SECOND ASSIGNMENT OF ERROR

■ Gould's second assignment of error is that LUBA's order "is unlawful in substance and is not based on substantial evidence in its determination that the hearings officer's conditions of approval are adequate to ensure Code compliance with 'no net loss' of fish resources or are adequate to identify the required mitigation plans." LUBA rejected Gould's argument that the hearings officer had failed to require compliance with specific fish mitigation plans as a condition of approval of the FMP. The hearings officer imposed this condition:

"38.  [Thornburgh] shall abide by the April 2008 Wildlife Mitigation Plan, the August 2008 Supplement, and agreements with the BLM and ODFW for management of off-site mitigation efforts. Consistent with the plan, [Thornburgh] shall submit an annual report to the county detailing mitigation activities that have occurred over the previous year. The mitigation measures include removal of existing wells on the subject property, and coordination with ODFW to model stream temperatures in Whychus Creek."

As condition 39, the hearings officer required restoration of in-stream water in Whychus Creek through a Three Sisters Irrigation District conservation project; that restoration was

mentioned in the August 11, 2008, letter as possible mitigation that "would be in addition to the amount of mitigation water already described in Thornburgh's Addendum."

LUBA reasoned that, although condition 38 could be clearer, it requires compliance with the Terrestrial WMP, the M&M Plan, the Fish WMP, and the August 11, 2008, letter regarding Whychus Creek mitigation. Gould argues that LUBA erred and that there was no basis for LUBA to conclude that the Fish WMP and the August 11, 2008, letter were included in the condition of approval.[4] Thornburgh acknowledges before this court, as it did before LUBA, that it must comply with the fish mitigation plan documents that it submitted to the county, and it contends that the conditions of approval are sufficiently clear.

We agree with LUBA that the disputed documents (that is, the Fish WMP and the August 11, 2008, letter) were included in the condition of approval. Each document was labeled an "Addendum" to the "Fish and Wildlife Mitigation Plan." The hearings officer appears to have treated the "Wildlife Mitigation Plan" as a single plan with addenda: In the introduction to her findings of fact and conclusions of law, the hearings officer explains that she uses the abbreviation "WMP" to refer to "[Thornburgh's] Wildlife Mitigation Plan, including addenda." In the conditions of approval, the hearings officer referred to the WMP and "the August 2008 Supplement," an apparent reference to the M&M Plan, which was dated August 2008 and which, in the overview section of the M&M Plan, is described as "a supplement to the original Mitigation Plan." Under the circumstances, LUBA did not err in concluding that the conditions of approval included compliance with the Fish WMP and the August 11, 2008, letter.

---

[4] Gould asserts that the Fish WMP and the August 11, 2008, letter are not the entire fish mitigation plan, because Thornburgh also submitted an "Evaluation of the Proposed Thornburgh Resort Project Impact on Hydrology and Fish Habitat." That May 2008 document appears to be strictly an analysis of the plan, and Gould does not identify any mitigation plan provisions that are proposed in that 311-page document.

### III.   GOULD'S THIRD ASSIGNMENT OF ERROR

In her third assignment of error, Gould contends that the hearings officer's findings regarding fish resources were inadequate because the hearings officer simply repeated the parties' arguments without making any "actual findings of compliance" and failed to address the need for mitigation of impacts on the cool habitat patches in the mainstem Deschutes River. The record does not support Gould's argument, and we reject it without further discussion.

### IV.   THORNBURGH'S CROSS-PETITION FOR JUDICIAL REVIEW

■      In its cross-petition, Thornburgh argues that its wildlife mitigation plan was specific enough to meet the requirements of DCC 18.113.070(D), as interpreted by this court in *Gould II*, and that LUBA erred by concluding otherwise.

To frame our analysis, we begin with a detailed discussion of *Gould II* and *Gould IV*. In *Gould II*, the county had approved Thornburgh's CMP with the condition that Thornburgh abide by its memorandum of understanding (MOU) with the BLM concerning wildlife mitigation. 216 Or App at 156. The MOU required Thornburgh

> "to complete a wildlife impact mitigation plan that 'will specify mitigation measures that are sufficient to insure that there is no net loss of wildlife habitat values as a result of the proposed development.' The agreement requires approval of the plan by ODFW and BLM and commits Thornburgh to 'work cooperatively with ODFW and BLM to determine the specific locations where the mitigation plan will be implemented.' The agreement provides that certain mitigation measures may be undertaken within the Masten Allotment, and those measures 'may include' trail construction, removal of old trails, fencing, vegetation thinning and management, and noxious weed controls."

*Id.* at 157. LUBA concluded that, in light of Thornburgh's wildlife report and its MOU with the BLM, the record contained substantial evidence to support the county's finding that Thornburgh's CMP complied with DCC 18.113.070(D), the "no net loss" standard. 216 Or App at 157-58. The issue on appeal was "whether LUBA erred in affirming the

county's findings that the conceptual master plan application complied with DCC 18.113.070(D) because an acceptable mitigation plan was feasible and likely to be adopted by BLM, ODFW, and Thornburgh." *Gould II*, 216 Or App at 159. We concluded:

> "LUBA's opinion and order was unlawful in substance for the reasons that follow. First, the county's findings were inadequate to establish the necessary and likely content of any wildlife impact mitigation plan. Without knowing the specifics of any required mitigation measures, there can be no effective evaluation of whether the project's effects on fish and wildlife resources will be 'completely mitigated' as required by DCC 18.113.070(D). ORS 215.416(9) requires that the county's decision approving the CMP explain 'the justification for the decision based on the criteria, standards and facts set forth' in the decision. The county's decision is inconsistent with ORS 215.416(9) because the decision lacks a sufficient description of the wildlife impact mitigation plan, and justification of that plan based on the standards in DCC 18.113.070(D). Second, that code provision requires that the content of the mitigation plan be based on 'substantial evidence in the record,' not evidence outside the CMP record. In this case, the particulars of the mitigation plan were to be based on a future negotiation, and not a county hearing process. Because LUBA's opinion and order concluded that the county's justification was adequate despite those deficiencies, the board's decision was 'unlawful in substance.' "

*Id.* at 159-60 (footnote omitted).

We rejected Thornburgh's argument that a finding of feasibility, coupled with a condition requiring adoption of a mitigation plan, was enough to show compliance with DCC 18.113.070(D). *Id.* at 160-62. Thornburgh relied, in part, on *Meyer v. City of Portland*, 67 Or App 274, 678 P2d 741, *rev den*, 297 Or 82 (1984), which we described as requiring that

> "a proposed land development plan must be specific and certain enough to support findings that the proposal satisfies the applicable approval criteria. If the nature of the development is uncertain, either by omission or because its composition or design is subject to future study and determination, and that uncertainty precludes a necessary conclusion of consistency with the decisional standards, the

application should be denied or made more certain by appropriate conditions of approval."

*Gould II*, 216 Or App at 161. In *Gould II*, we explained that

"the county implicitly concluded (but did not directly find) that the nature of the wildlife impact mitigation plan was sufficiently certain and probable to allow a present determination of consistency with the approval criterion. LUBA found that the findings were 'adequate' to explain compliance with DCC 18.113.070(D).

"But the governing ordinance requires a *Meyer* determination of whether 'solutions to certain problems * * * are * * * likely and reasonably certain to succeed'—whether the findings and conditions of the conceptual master plan approval adequately support the conclusion that 'any negative impact on fish and wildlife resources will be completely mitigated so that there is no net loss or net degradation of the resource' as required by DCC 18.113.070(D). The adopted findings fail to make that case.

"The wildlife impact mitigation plan was not yet composed. Although Thornburgh's consultant proposed a number of offsite mitigation measures on federal land, the BLM reported that these measures needed 'clarification and further development.' In particular, the agency asked that the effect of the development on deer and elk winter range and habitats along a nearby river be clarified. It noted that '[i]t is unclear what types of habitat conditions the resort intends to provide on-site compared to off-site.' The BLM concluded that '[s]everal items included in the draft report would not be considered appropriate off-site mitigation,' including removal of grazing on the resort property and from offsite mitigation areas, placing rocks on offsite mitigation areas, creation of new water sources for wildlife, and closure of existing roads and trails. Thus, the particular nature of the wildlife impact mitigation plan was not known at the time of the CMP hearing.

"The county development code requires that the conceptual master plan application include the 'methods employed to mitigate adverse impacts on [wildlife] resources.' DCC 18.113.050(B)(1). That requirement allows little speculation. The code mandates that the applicant submit a 'proposed [wildlife] resource protection plan.' That requires that the submitted plan be specific enough to apply the approval standards in a meaningful way. The code

requirements set out the necessary foundation for a determination that '[a]ny negative impact on fish and wildlife resources will be *completely mitigated* so that there is no net loss or net degradation of the resource.' DCC 18.113.070(D) (emphasis added). The county's substitute of an uncertain plan, a plan yet to be composed, violates those requirements.

"The county decision was also defective for a second reason. The code mandates that the approval standards be evaluated 'from substantial evidence in the record.' DCC 18.113.070(D). That provision requires that the justification be based on evidence submitted at public hearings on the application. The county's decision, however, allows the mitigation plan justification to be established by future discussions among Thornburgh, ODFW, and BLM, and not on evidence submitted during the public hearings. That robs interested persons of the participatory rights allowed by the county ordinance."

*Id.* at 162-63 (alterations in *Gould II*).

Later, in *Gould IV*, Gould challenged the county's conditional approval of Thornburgh's CMP, contending that LUBA erred regarding the legal sufficiency of the county's condition and findings postponing its review of Thornburgh's mitigation plan to later hearings on the FMP. 227 Or App at 603. As we summarized our earlier decision in *Gould II*, the county's initial approval of Thornburgh's CMP "was improper because the mitigation plan was not yet composed and part of the evidentiary record before the county, and therefore the necessary findings about the sufficiency of that plan could not be made." *Gould IV*, 227 Or App at 606. In addition, we noted, the county had used the wrong standard to evaluate the sufficiency of the evidence; under *Meyer*, "the evidentiary record of a land use decision must show that compliance with the approval standards was 'likely and reasonably certain,' without regard to any modification as a result of later administrative review." *Id.* (quoting *Gould II*, 216 Or App at 161 (citing *Meyer*, 67 Or App at 280 n 5)). We rejected Gould's argument that the *Meyer* standard had to be met to justify postponement of the determination of compliance with DCC 18.113.070(D). *Gould IV*, 227 Or App at 609-10. Rather, we agreed with LUBA's conclusion that

"a finding under *Meyer* (that the local government record shows that compliance with DCC 18.113.070(D) is 'likely and reasonably certain to succeed') is not necessary to postpone consideration of compliance with the approval standard. Rather, such a finding under *Meyer* would suffice to justify final adjudication of compliance with the approval criterion, as opposed to putting that determination off for another day."

*Id.* at 610.

With that background in mind, we turn to the LUBA decision at issue here. LUBA sustained Gould's assignments of error concerning the adequacy of Thornburgh's Terrestrial WMP and M&M Plan. Regarding Thornburgh's plan to restore 4,501 acres of juniper woodlands on BLM land, LUBA reasoned:

"The Terrestrial WMP and M&M Plan provide a fair amount of detail about the kinds of habitat restoration activities that might be employed to improve the habitat value of the 4,501 acres that are to be selected in the future. The record also indicates that Thornburgh's consultant and BLM and ODFW staff are confident that those restoration efforts will be successful and result in compliance with DCC 18.113.070(D). But what our description and the hearings officer's description of the Terrestrial WMP and M&M Plan make clear is that a number of important parts of Thornburgh's proposal to comply with the DCC 18.113.070(D) 'no net loss' standard have not yet been determined, and will not be determined until a future date at which [Gould] may or may not have any right to comment on the adequacy of the proposed mitigation. We do not know the location of the 4,501 acres that will be restored to provide the required mitigation. They may be located in the Canyons Region, the Deep Canyons Region or the Maston Allotment. Or they may be located somewhere else in Deschutes County. Until those 4,501 acres are located we cannot know what kind of habitat those 4,501 acres provide, and we cannot know what the beginning habitat value of those 4,501 acres is. We also do not know what particular mix of restoration techniques will be provided to those 4,501 acres. We do not know what the habitat value of those 4,501 acres will be after restoration. We therefore cannot know if that restoration effort will result in the needed 8,474 HUs. The question for us is whether given all of these uncertainties, the

confidence of Thornburgh, BLM and ODFW is sufficient to provide substantial evidence that the proposed mitigation plan will result in compliance with DCC 18.1[1]3.070(D). The answer to that question under the principles articulated in *Gould II* is no.

"While we have no reason to doubt the professional judgment of Thornburgh's consultant and the staff at BLM and ODFW, under the Court of Appeals' decision in *Gould II*, [Gould] has a right to confront the mitigation plan that Thornburgh intends to rely on to comply with DCC 18.113.070(D). While we know more about what that mitigation plan might ultimately look like than we did when *Gould I* and *Gould II* were decided, there are simply too many remaining unknowns in the Terrestrial WMP and M&M Plan to allow [Gould] a meaningful chance to confront the adequacy of that plan. *See Gould II*, 216 Or App [at] 159-60 ('Without knowing the specifics of any required mitigation measures, there can be no effective evaluation of whether the project's effects on fish and wildlife resources will be "completely mitigated" as required by DCC 18.113.070(D). * * * [T]hat code provision requires that the content of the mitigation plan be based on "substantial evidence in the record," not evidence outside the CMP record.'). The details that must be supplied before [Gould] can be given that meaningful chance to confront the proposed mitigation plan will not be known until some undetermined future date. Under the Court of Appeals' holding in *Gould II*, that is not a permissible approach for demonstrating compliance with DCC 18.113.070(D)."

(Footnote omitted; omission and alteration to quotation from *Gould II* in LUBA order.)

In its cross-petition for judicial review, Thornburgh argues that "LUBA erred in concluding that the proposed wildlife mitigation plan does not meet the requirements of DCC 18.113.070(D) as interpreted by the Court of Appeals in *Gould II*." Thornburgh contends that LUBA incorrectly applied the substantial evidence test in light of *Gould II* and the record in this case. In Thornburgh's view, although "the BLM legally could not commit itself to provide a specific location where mitigation was to occur," the BLM's CBRAP was likely to be finalized, and mitigation on three areas within the Cline Buttes Recreation Area would then be welcome.

Thornburgh further contends that the strategy and monitoring process are sufficient to show that the mitigation plan is reasonably likely to succeed.

Gould responds that Thornburgh's mitigation "strategy" is too indefinite to be a "plan" that meets the mitigation standard and that, without knowing more about the location of the mitigation site—which could be anywhere in Deschutes County—it is impossible to say what kind of habitat the site will provide and whether the site will mitigate the habitat lost because of the development. In Gould's view, details are especially necessary because the proposed development will affect thousands of acres of habitat, and too many details are left to BLM, which is not obligated to comply with DCC 18.113.070(D).

As noted, LUBA reasoned that the Terrestrial WMP is inadequate because the location of mitigation efforts could be at one of the three BLM sites or "somewhere else in Deschutes County." Without specific identification of the acres where restoration will occur, LUBA noted, one cannot assess the existing habitat and its value, know the particular mix of restoration techniques to be used, or determine the post-restoration habitat value.

As we explained in *Gould IV*, a final adjudication of compliance requires a showing that compliance with DCC 18.113.070(D) is " 'likely and reasonably certain to succeed.' " 227 Or App at 610 (quoting *Meyer*, 67 Or App at 280 n 5). We do not understand LUBA to have concluded that, if the proposed mitigation approach outlined in the M&M Plan occurred on one of the three parcels of BLM land, there was a lack of substantial evidence that the Terrestrial WMP was likely and reasonably certain to succeed. To the contrary, LUBA noted that it had "no reason to doubt the professional judgment of Thornburgh's consultant and the staff at BLM and ODFW." However, as LUBA noted, it remained uncertain whether the habitat restoration would in fact occur on BLM land or, rather, elsewhere in Deschutes County, through Thornburgh's back-up plan of a dedicated fund to be used by ODFW for mitigation.

If the only remaining uncertainty in Thornburgh's mitigation plan were which portion of BLM land would be the

site of habitat restoration, we would conclude that LUBA erred in its application of *Gould II*. There, *no* mitigation plan had been composed; Thornburgh was required only to complete a plan and to obtain ODFW and BLM approval of it. 216 Or App at 156-57; *see also Gould IV*, 227 Or App at 606 (explaining that the county's approval of the CMP "was improper because the mitigation plan was not yet composed and part of the evidentiary record before the county, and therefore the necessary findings about the sufficiency of that plan could not be made"). Here, the nature of the mitigation plan proposed for BLM land is clear: the Terrestrial WMP provides that Thornburgh will restore and enhance about 4,501 acres of juniper woodlands within the Cline Buttes Recreation Area, and the M&M Plan sets out mitigation methods that could be applied to any parcel of land within that area. Thus, the adequacy of Thornburgh's mitigation efforts as they pertain to BLM land can be assessed now, based on the record as it exists. If some portion of BLM land turns out to be unsuitable for mitigation or if some mitigation methods are inappropriate, those objections could be raised, and the county could deny approval of the FMP on that basis or could condition approval to address those objections.

LUBA also concluded, however, that it had not yet been determined whether Thornburgh's restoration efforts would in fact occur on BLM land. The BLM was still finalizing the CBRAP and so had not yet committed to allowing Thornburgh's proposed habitat restoration to occur on BLM land. Further, Thornburgh's back-up plan of a dedicated fund for mitigation suffers from the same defects as the plan at issue in *Gould II*. In light of those uncertainties, we cannot conclude that LUBA erred in exercising its review authority and concluding that Thornburgh's proposed mitigation efforts are not likely and reasonably certain to result in compliance with DCC 18.113.070(D).

Affirmed on petition and cross-petition.