Argued and submitted October 26, 2011, affirmed February 15, 2012

WILLAMETTE OAKS, LLC,
*Petitioner,*

*v.*

CITY OF EUGENE;
and Goodpasture Partners, LLC,
*Respondents.*

Land Use Board of Appeals
2011027; A149455

273 P3d 219

Zack P. Mittge argued the cause for petitioner. With him on the brief were William H. Sherlock and Hutchinson, Cox, Coons, DuPriest, Orr & Sherlock, P.C.

Seth J. King argued the cause for respondent Goodpasture Partners, LLC. With him on the brief were Michael C. Robinson and Perkins Coie LLP.

Emily N. Jerome waived appearance for respondent City of Eugene.

Before Ortega, Presiding Judge, and Brewer, Chief Judge, and Sercombe, Judge.*

SERCOMBE, J.

---

* Brewer, C. J., *vice* Hadlock, J.

## SERCOMBE, J.

Petitioner Willamette Oaks, LLC (Willamette) seeks review of an opinion and order of the Land Use Board of Appeals (LUBA or board). LUBA remanded a decision by the City of Eugene approving plans for a modified tentative planned unit development (PUD), a final PUD, and a tentative subdivision for a five-parcel multi-family residential development proposed by Goodpasture Partners, LLC (Goodpasture). However, LUBA affirmed the city's approval of certain modifications to the tentative PUD related to the development of parcel four and a condition limiting the number of motor vehicle trips to the development site. Willamette contends that LUBA erred in affirming the city's approval of those modifications. Additionally, Willamette contends that LUBA plainly erred by remanding, rather than reversing, the city's decision and that we should exercise our discretion to correct that error. *See Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991). We affirm.

The relevant facts are undisputed. On June 14, 2010, the city approved Goodpasture's application for a tentative PUD for an approximately 23-acre development, including

> "a four-story, age-restricted apartment building, 10 three-story apartment buildings, two clubhouses and one one-story commercial building, with open space, parking and associated infrastructure."

According to the approved tentative plans, the four-story apartment building would be located on an 8.14-acre parcel (parcel four) and contain 125 units of age-restricted residences. The apartment building's main entrance, driveway, and parking lot would be at grade. Additionally, the plans provided for a landscaped buffer of trees and shrubs along the northern and southern property lines, garages on the northern and southern portions of the property, a bicycle parking facility on the southern portion of the property, and a six-foot fence along the southern property line. The lighting plan limited illumination near the perimeter of the building to Medium-Ambient standards.

Based on the tentative plans, the hearing official found that the proposed development complied with the Eugene Code. The city planning commission affirmed that decision. Subsequently, in July 2010, Goodpasture applied for modification of the tentative PUD, final PUD approval, and tentative subdivision approval. The relevant proposed modifications to the tentative PUD primarily concern the development of parcel four. Specifically, Goodpasture proposed to modify the approved use of the apartment building to also accommodate assisted-living and memory-care residents and to decrease the density of the building from the approved 125 units to 111 units. Additionally, Goodpasture sought approval of physical changes to the apartment building and other parts of the development on parcel four, including the following: (1) reducing the number of stories within the apartment building from four to three, thereby decreasing the height of the building by seven feet and the building's footprint from 49,050 square feet to 42,650 square feet; (2) using fill and retaining walls to create a "graded entry drive to bring vehicles from street grade up to a second level round-a-bout, and porte-cochere drop off area which provides access to the main building entry"; (3) eliminating the garages; (4) reducing the number of parking stalls; (5) adding a maintenance shed to the northeast corner of the property; (6) eliminating the bicycle parking facility on the southern portion of the property; and (7) altering the landscaping on the northern and southern property lines.

The city planning director approved Goodpasture's applications. Willamette appealed to the hearing official and contended, among other things, that the proposed modification of the tentative PUD did not meet the criteria for approval under Eugene Code (EC) 9.8335. That code provision permits modification of an approved tentative PUD only if two criteria are met. First, the proposed modification must be consistent with the conditions of the original approval." EC 9.8335(1). Second, the proposed modification must only "result in insignificant changes in the physical appearance of the development, the use of the site, and impact on the surrounding properties." EC 9.8335(2). The hearing official found that, because the proposed modification was consistent with the conditions of approval imposed by the city when it

simultaneously approved and reconditioned the final PUD, the requirement of EC 9.8335(1) was met. The hearing official also determined that EC 9.8335(2) was met because the proposed changes to the development's physical appearance, use, and impact on surrounding properties were insignificant. Additionally, the hearing official deferred the analysis of the geotechnical data, which was required as a condition of the original tentative PUD to occur at the final PUD stage, until later administrative permitting stages. The hearing official also revised the vehicle trip cap condition that was imposed as part of the original tentative PUD to provide that,

> "[p]rior to executing the performance agreement, the applicant shall revise the final site plan to add the following note: 'The maximum development on the site shall be limited so that it would not produce more than 287 trips in the AM peak hour and 321 trips during the PM peak hour as determined by the Institute of Transportation Engineers Trip Generation Manual, using code 230—Apartments for all unrestricted residential apartments on the development site. The city may allow development intensity beyond this maximum number of peak hour vehicle trips only if the applicant submits to the city and ODOT a traffic impact analysis that demonstrates that the proposed intensification of use would be consistent with the Transportation Planning Rule (TPR) at OAR 660-012-0060. The applicant shall seek and the city shall consider such approval using the city's Type II land use application procedure. Prior to construction of the final phase, the applicant shall conduct a current traffic study that counts the actual number of trips currently occurring to determine if the final phase would require a revised traffic impact analysis and additional improvements to comply with the Transportation Planning Rule. The city shall not issue building permits for the final phase until the applicant has received approval of the revised traffic impact analysis.' "

The hearing official explained the reason for the revision:

> "At the hearing, the applicant stated that it believed the trip cap would allow an increase in the number of trips from Parcel 4 at this time, because the trip cap is for the overall development, which would occur in many phases. With this approach, the applicant would need to evaluate the actual number of trips before constructing the later phases and revise the traffic analysis if necessary. The hearing official

agrees that is a plausible interpretation of [the trip cap condition] and will revise [it] to make this clear * * *."

Willamette sought review of the city's decision by LUBA, asserting, among other things, that the city misconstrued EC 9.8335. Specifically, Willamette asserted that the city erred in approving modification of the tentative PUD because the proposed modifications were not consistent with the conditions of *original* approval and they resulted in more than insignificant changes to the development's physical appearance, use, and impact on surrounding properties. Additionally, Willamette asserted that the city erred in approving a final PUD that did not conform to the approved tentative PUD and its conditions, in deferring the geotechnical analysis to later stages, and in modifying the trip cap condition.

LUBA determined that the city erred when it

"determined that EC 9.8335(1), which applies to Tentative PUD modifications, [was] met because the city approved the *Final PUD* with, at least in some cases, modified versions of the original conditions of approval, and that action resolved any inconsistencies between the conditions of the original approval and the proposed modifications under EC 9.8335(1). * * * There is simply nothing in EC 9.8335(1) that purports to give the planning director or the hearings officer the authority to overlook inconsistency with any 'conditions of the *original* approval,' or to modify those original conditions of approval in evaluating the modification proposal for consistency with the conditions of the original Tentative PUD approval under EC 9.8335(1)."

*Willamette Oaks, LLC v. City of Eugene*, ____ Or LUBA ____ , ____ (LUBA No 2011-027, Aug 9, 2011) (slip op at 6) (*Willamette II*) (emphases in original). On that basis, LUBA determined that the city could not overlook conditions in the original tentative PUD related to the bicycle parking facility simply because Goodpasture had proposed to eliminate the facility altogether. Accordingly, LUBA found that the part of Goodpasture's modification request to eliminate the bicycle parking facilities on the south side of parcel four was not consistent with the conditions of original approval that governed that particular facility.

LUBA also concluded that the city failed to justify that the proposed modifications would result in an insignificant change in the *use* of the site. Specifically, LUBA determined that the city's findings were

> "inadequate because they do not address * * * whether a change in the proposed use [from independent living apartments to an assisted living and memory care facility] that results in an increase in the number of employees and visitors to and from the site, particularly during the morning and afternoon peak hours, an increase in the traffic to and from the site, and an alteration in the distribution of traffic in the affected facilities means that the change in use is 'insignificant.'"

*Id.* at _____ (slip op at 16). LUBA remanded that part of the decision to the city for additional findings. However, LUBA affirmed the city's EC 9.8335 justification in its findings on the insignificance of changes to the *development's appearance* and *impact on surrounding properties.*

LUBA further determined that, because "[t]he city's decision to approve the Final PUD application and the tentative subdivision application is necessarily dependent on our upholding the modification decision, * * * the city also erred in approving the Final PUD and tentative subdivision applications that include the modifications that 'may not occur.'" *Id.* at _____ (slip op at 17). Nevertheless, the board considered the portions of Willamette's remaining assignments of error relating to the final PUD application. After doing so, it determined that the final PUD did not conform to the tentative PUD because the final PUD increased the unit count for parcels two and five, changed the unit mix for parcels one, two, and five, and increased bicycle parking on parcels one and five. LUBA also concluded that the city erred in conditioning "approval of the Final PUD on future satisfaction of the Tentative PUD condition[s] of approval." *Id.* at _____ (slip op at 21). According to LUBA,

> "where the conditions of the Tentative PUD approval required some action to be taken or some documentation to be provided 'prior to final PUD approval,' the city must, in evaluating a Final PUD application, determine whether that action has been taken or that documentation provided.

If it has not, then the Final PUD cannot be approved under EC 9.8365."

*Id.* at ____ (slip op at 20-21). Relatedly, LUBA determined that the city erred in failing to conduct the geotechnical analysis prior to the final PUD as the tentative PUD had required. The city's attempt to defer that analysis to later permitting stages was error because those stages "do not allow for public review of or participation in the city's decision." *Id.* at ____ (slip op at 23). Finally, LUBA determined that the city's modification of the trip cap condition was proper. LUBA remanded the city's decision.[1]

On review, Willamette raises three assignments of error. First, Willamette asserts that LUBA erred in affirming the city's decision to approve several of the proposed modifications to the original tentative PUD. Willamette contends that the approved modifications "changed elements that were the basis of the original approval[ ] and substantially changed uses and impacts of the development in ways which were not anticipated in the original plan." Specifically, Willamette contends that the proposed modifications undermine the city's findings that were used in support of the original tentative PUD approval, namely, a finding that the development on parcel four would be adequately screened from surrounding properties. Goodpasture responds that the relevant consideration is not whether the proposed modifications "undermine the basis of the underlying tentative PUD approval," but whether a change is "not insignificant" under EC 9.8335. Goodpasture contends that LUBA properly concluded that it was within the city's discretion to find the changes insignificant in the context of the entire development.

We reject Willamette's contentions that LUBA erred in affirming certain modifications to the tentative PUD for parcel four (the change in screening and lighting requirements, the additional fill for the driveway, change of building use) because those changes were not "insignificant changes in the physical appearance of the development * * * and

---

[1] LUBA did not consider Willamette's assignments of error that challenged the city's approval of the tentative subdivision, because it determined that those challenges were premature due to the city's error in approving the final PUD.

impact on the surrounding properties" under EC 9.8335(2). Willamette fails to explain how LUBA erred in evaluating whether the changes were insignificant under EC 9.8335(2). Instead, Willamette argues that the *city* improperly decided the question. Our task is not to review the city's decisions, but to review LUBA's opinion on whether it is "unlawful in substance or procedure." ORS 197.850(9)(a). LUBA's opinion notes the requested changes to parcel four, Willamette's contentions that those modifications were not "insignificant" under EC 9.8335(2), and the city's findings on the insignificance of those changes. LUBA then concluded:

> "However, as we understand it, the planning director and the hearings officer concluded that the proposed changes are 'insignificant' given the size of the overall development on all of the parcels, the fact that the changes actually decrease the size of the building, and the changes leave the building entry and parking on the same side of the property and do not affect views of the river. Willamette does not explain why the hearings officer's conclusions set forth in the findings quoted above are incorrect."

*Willamette II*, ___ Or LUBA at ___ (slip op at 14).

On review, Willamette does not explain why LUBA's conclusion—that it failed to identify legal error in the city's findings—is incorrect. To do so, Willamette must identify specific legal contentions it made to LUBA and how LUBA erred in its review of those specific assertions. Here, Willamette does not identify its explanation to LUBA on why the city's construction of the term "insignificant" was error or, for that matter, quibble with LUBA's actual holding in any way. We are left empty-handed in assessing the validity of LUBA's conclusion that the explanation was lacking. We thus conclude that Willamette's arguments were not significantly developed for our review.[2]

Willamette next contends that LUBA erred in approving a modification to the original trip cap condition.

---

[2] To whatever extent Willamette now seeks to argue that the modifications to parcel four should have been assessed anew under the provisions of the Eugene Code that establish the criteria for a tentative PUD approval, that claim of error was not preserved before LUBA and cannot be the basis of any disposition in this case. *See* ORAP 5.45 (requiring preservation of error in appellate proceedings).

Willamette asserts that the proposed change in use from an age-restricted apartment building to an assisted living facility will cause trips to occur in excess of the trip cap and, therefore, the change violates the original trip cap condition. Further, Willamette asserts that LUBA's decision affirming the city's modification of the condition itself is error because, as LUBA found in another context, the hearing official may not "modify those *original* conditions of approval in evaluating the modification proposal for consistency with the conditions of the original Tentative PUD approval." *Id.* at ____ (slip op at 6) (emphasis in original). Willamette also asserts that the modification of the trip cap provision "improperly defers [Transportation Planning Rule (TPR), OAR 660-012-0060,] compliance to a final construction phase without notice or an opportunity for a hearing" and that the city failed to make a feasibility finding necessary to that deferral.

We reject those contentions as well. The original trip cap condition on rezoning required the following:

"Prior to final PUD approval, the applicant shall revise the final site plan to add the following note: 'The maximum development on the site shall be limited so that it would not produce more than 287 trips in the AM peak hour and 321 trips during the PM peak hour as determined by the Institute of Transportation Engineers Trip Generation Manual. The city may allow development intensity beyond this maximum number of peak hour vehicle trips only if the applicant submits to the city and ODOT a traffic impact analysis that demonstrates that the proposed intensification of use would be consistent with the Transportation Planning Rule * * *. The applicant shall seek and the city shall consider such approval using the city's Type II land use application procedure.' "

The effect of the condition was to limit the amount of traffic to that generated by the previous R2 zoning in order to approve a change of zone to R3. That condition obviated the need to show compliance with the TPR since the change of zone would not "significantly affect" a transportation facility because there would be no increase in traffic.

Willamette appealed the rezoning and contended that the trip cap condition was unlawful for a variety of reasons. *Willamette Oaks, LLC v. City of Eugene,* ____ Or LUBA

\_\_\_\_ (LUBA Nos 2010-060, 2010-061, 2010-062, Mar 8, 2011) (*Willamette I*). Willamette argued that the trip cap was unenforceable "because it does not include a monitoring or enforcement mechanism." *Id.* at \_\_\_\_ (slip op at 21). LUBA responded:

> "[T]he trip cap is monitored and enforced when the city receives an application for a building permit under the final, approved PUD and site plan and then allocates from the trip cap the number of trips associated with a particular use at the time a building permit is issued for that use. According to Goodpasture * * *, after all of the trips within the trip cap have been allocated, no further development of the property can occur unless the trip cap is increased. The city will monitor trips by monitoring the building permits issued as development occurs. While [the condition] does not provide quite that level of detail about how [it] will be enforced, evidence in the record supports the city's conclusion that the trip cap is enforceable."

*Id.* at \_\_\_\_ (slip op at 21-22). Willamette also argued that the trip cap was an improper deferral of compliance with the TPR. *Id.* at \_\_\_\_ (slip op at 23). LUBA also rejected that contention, concluding that

> "[w]e agree with the city that it did not defer a current finding of compliance with the TPR, and that nothing in the city's requirement that any modification of the trip cap condition of approval must undergo Type II review runs afoul of *Gould* [*v. Deschutes County*, 216 Or App 150, 162, 171 P3d 1017 (2007)]."

*Id.* at \_\_\_\_ (slip op at 24). We affirmed on Willamette's assignments of error about the trip cap condition in *Willamette Oaks, LLC v. City of Eugene*, 245 Or App 47, 50, 261 P3d 85 (2011).

In subject proceedings before the city, it reimposed the original trip cap condition and supplemented the text of the condition in two respects: (1) it inserted a specific use category ("code 230—Apartments for all unrestricted residential apartments on the development site") for calculation of future trip generation, a refinement consistent with the original approval; and (2) it added a required traffic study prior to the final phase of the PUD. The added provision reads:

"Prior to construction of the final phase, the applicant shall conduct a current traffic study that counts the actual number of trips currently occurring to determine if the final phase would require a revised traffic impact analysis and additional improvements to comply with the Transportation Planning Rule. The city shall not issue building permits for the final phase until the applicant has received approval of the revised traffic impact analysis."

LUBA interpreted Willamette's complaints about the modified trip cap condition to pertain to the insertion of a specific use category for purposes of measuring traffic generation. We agree that Willamette's arguments to the board were not so limited. Before the board, and before us, Willamette argues that the modified trip cap condition was violated by the small increase in traffic generated by the proposed use on parcel four, that the modification impermissibly altered an original condition of approval, and that the evaluation of additional traffic was improperly postponed to the building permit stage.

The changes to the condition did not alter its operative effect. Both in its original and modified form, the condition "is monitored and enforced when the city receives an application for a building permit under the final, approved PUD and site plan and then allocates from the trip cap the number of trips associated with a particular use at the time a building permit is issued for that use." *Willamette I*, ____ Or LUBA at ____ (slip op at 21). LUBA earlier concluded that this enforcement mechanism does not improperly defer compliance with the TPR. *Id.* at ____ (slip op at 24). We fail to see how a supplementary enforcement tool—a mandated traffic study before undertaking the final phase of the PUD—undercuts the legal or practical efficacy of the original condition. It merely requires a potential traffic impact analysis before issuing any one of a group of building permits, in addition to allocating traffic generation on a building permit-by-permit basis. Should that traffic impact analysis be used to intensify the allowed development, it would be subject to the "approval using the city's Type II land use application procedure" under the terms of the original condition. Willamette does not

explain, and we do not discern, any reason why the application of the TPR to the entire rezoned site requires more process or justification.[3]

Willamette's final contention presents a closer question. Willamette asserts that LUBA erred by remanding, instead of reversing, the city's decision regarding each application. More specifically, Willamette argues that the matters were remanded by LUBA because, in part, the removal of the bicycle parking facilities on parcel four in the proposed modification could not comply with the tentative PUD conditions of approval related to those facilities. EC 9.8335 provides that, if a modification does not comply with the conditions of the original approval, "the proposed modification may not occur." Accordingly, Willamette reasons that the only option for the city is to deny the entire tentative PUD modification request (and the related final PUD and subdivision approvals), and that this required result necessitates a reversal, rather than a remand, from LUBA.

Goodpasture responds that Willamette did not seek reversal of the city decisions in its petition for review before LUBA. Instead, Willamette sought "reversal or remand" of those decisions. Given that prayer, Goodpasture argues that Willamette did not preserve its contention that a particular claimed error required reversal, and not remand, of those decisions. Goodpasture further responds that Willamette's contention that LUBA erred by remanding, instead of reversing, the city's decision is not plain error because whether an error occurred is reasonably in dispute. Finally, Goodpasture asserts that, even if LUBA plainly erred, we should not exercise our discretion to correct that error.

---

[3] Relatedly, Willamette's contention that the TPR requires a justification of the effects of the allowed change of use on parcel four is misplaced. The rule requires an assessment of a "land use regulation amendment" (such as the rezoning of the entire site in this case from R2 to R3) on whether the amendment will "significantly affect[ ] a transportation facility," and, if so, the rule directs particular reciprocating measures. OAR 660-012-0060. The measures required by the rezoning approval here, the trip cap condition, applied to the development on the entire site. There is no reason to conclude that the TPR requires a more particular reciprocating action for intensifying the use on a portion of the rezoned site, so long as the entire rezoning will not significantly affect a transportation facility.

We conclude that Willamette did not preserve its contention that the claimed errors required reversal of the city decisions and that any error of LUBA in failing to reverse is not plain. Our rules and practice require a party to articulate a contention in a lower court or tribunal in order to assert on review that the court or tribunal erred in taking action inconsistent with that contention. ORAP 5.45(1) provides, in part, that "[n]o matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court * * * provided that the appellate court may consider an error of law apparent on the record." That preservation requirement applies to review of administrative agency decisions in general, and to review of LUBA orders and opinions in particular. *VanSpeybroeck v. Tillamook County*, 221 Or App 677, 690-91, 191 P3d 712 (2008). We explained in *VanSpeybroeck* that the statutory context of the LUBA review statutes lends particular force to the requirement of preservation of error before the board:

> "Under the statutes that apply to review of quasi-judicial local government land use decisions, the failure to raise an issue to a local decision-maker precludes appeal to LUBA based on that issue. ORS 197.195(3)(c)(B); ORS 197.763(5)(c); ORS 197.835(3). Moreover, review of local government land use decisions is subject to statutory deadlines for LUBA, ORS 197.830(14), and this court, ORS 197.855(1). That statutory framework suggests that issues be preserved at the local government level for board review, and at LUBA level for judicial review, in sufficient detail to allow a thorough examination of the issue by the decision-maker, so as to potentially *obviate* the need for further review or at least to make that review more efficient and timely."

221 Or App at 691 n 5.

The LUBA rules of procedure require that a petitioner specify in the statement of the case part of a petition for review the "nature of the land use decision or limited land use decision and the relief sought by petitioner." OAR 661-010-0030(4)(b)(A). Given that requirement, and the noted preservation policies, it was incumbent upon Willamette to request in its statement of the case its desired relief if any of Willamette's claims of error were sustained. We conclude

that the requested "reversal or remand" with respect to all of Willamette's claims was insufficient to preserve the contention that the allowance of a particular subassignment of error required reversal—and not remand—of all of the local decisions.

Willamette does not claim that this error was preserved. Instead, it asks that we consider the error as plain under ORAP 5.45. In order to qualify as plain, an error

> "must be one 'of law'; * * * must be 'apparent,' *i.e.*, the point must be obvious, not reasonably in dispute; and * * * must appear 'on the face of the record,' *i.e.*, the reviewing court must not need to go outside the record to identify the error or choose between competing inferences, and the facts constituting the error must be irrefutable."

*Ailes*, 312 Or at 381-82 (quoting *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990)).

The appropriate disposition of the city's limited land use decisions by LUBA is a legal question that is presented by the record.[4] Willamette argues that the appropriateness of a reversal is apparent "because there is no reasonable dispute that OAR 660-010-0071(1)(c) and LUBA's precedents require reversal in this case." The relevant rule, OAR 661-010-0073(1), provides that

> "(1)  The Board shall reverse a limited land use decision when:
>
> "(a)  The governing body exceeded its jurisdiction;
>
> "(b)  The decision is unconstitutional; or
>
> "(c)  The decision violates a provision of applicable law and is prohibited as a matter of law."

Willamette explains that the part of the tentative PUD modification that eliminated bicycle parking facilities on the

---

[4] As defined by ORS 197.015(12), a "[l]imited land use decision" means the approval or denial of "a tentative subdivision or partition plan" or "an application based on discretionary standards designed to regulate the physical characteristics of a use permitted outright, including but not limited to site review and design review." A tentative PUD approval is a combination of both types of limited land use decisions.

south side of parcel four was found by LUBA to be inconsistent with the original conditions of approval that regulated those facilities. Thus, the "decision violates a provision of applicable law." EC 9.8335 requires that a tentative PUD modification be consistent with the original conditions of approval or else "the proposed modification may not occur." Willamette argues that the entire tentative PUD modification is, therefore, "prohibited by law." Because there could be no further action by the city but to deny the modification request, Willamette argues that a reversal by LUBA is compelled.

Willamette further relies upon a LUBA opinion explaining the distinction between the reversal and remand outcomes as follows:

> "The distinction that must be drawn is whether it is the *decision* or the *proposal* that must be corrected. Remand is appropriate in the first circumstance; reversal is appropriate in the latter circumstance."

*Angius v. Washington County*, 35 Or LUBA 462, 465 (1999) (emphasis in original). Willamette contends that the tentative PUD modification proposal must be corrected to add bicycle parking facilities and that the city approval decision cannot be amended to evaluate that different proposal, so that a reversal is required under the logic in *Angius*.

Willamette may be correct, but that outcome is not as certain as Willamette argues. The particular question—involving the meaning and application of LUBA rules of procedure—is new to us; there is no judicial precedent pointing to a clear resolution. LUBA decided some appeal issues concerning the application of the final PUD approval criteria in order to "provide necessary guidance to the city in evaluating that future Final PUD application." *Willamette II*, ____ Or LUBA at ____ (slip op at 18). In so doing, LUBA necessarily assumed that the local proceedings would not immediately conclude. We cannot easily tell if that assumption was misplaced.

The tentative PUD modification request to the city had several components and sought different changes to the

physical characteristics of the development approved for parcel four, including changes to the building mass, size, and design features as well as to the driveway, parking, landscaping, bicycle parking facilities, and other outbuildings. The parties do not discuss, and we cannot easily discern, whether, as a matter of local law, a city denial of any part of those modifications compels a denial of the entire tentative PUD modification application. Indeed, in its evaluation of the final PUD approval, LUBA assumed that to not be the case, noting that, "[w]here we conclude * * * that under EC 9.8335, the modification 'may not occur,' the 'approved tentative PUD' is the Tentative PUD without the proposed modifications."[5] *Id.* at _____ (slip op at 19). Assuming that a denial in part is not a denial in whole, it is not apparent if the original bicycle facilities that would be retained, with a denial of only that part of the tentative PUD modification, together with the remaining modifications and the original plans, could be consistent with the conditions of approval.

Moreover, we do not know if both the tentative and final PUD requests could be conditioned to cure any problem with the compliance of bicycle facilities with the original conditions of approval. In that case, the decision, rather than the proposal, could be modified by further city action. Suffice it to say, we cannot come to an easy conclusion that the only option available to the city following the LUBA decision would be to deny the entire tentative PUD modification application. Any error by LUBA in remanding for a different result is not obvious. Accordingly, any error by LUBA in this regard does not qualify for plain error review under ORAP 5.45.

In sum, we conclude that (1) LUBA did not err in affirming those parts of the city's decisions that concluded that the tentative PUD modifications were insignificant changes for purposes of EC 9.8335(1) and that amended the trip cap condition; and (2) any other error in the disposition of the case by LUBA was not preserved or plain.

Affirmed.

---

[5] Willamette did not appeal from LUBA's holdings on the final PUD approval.