TOOKEY, J.
*758 Petitioner Willamette Oaks, LLC (Willamette), seeks judicial review of an opinion and order of the Land Use Board of Appeals (LUBA), in which LUBA affirmed a decision by the City of Eugene that the final phase of the Goodpasture Island Planned Unit Development (PUD) complies with a PUD condition of approval. Specifically, the city determined, and LUBA concurred, that the proposed development of Phase 5 of the PUD satisfied Condition 3, which imposed a "trip cap," limiting vehicle trips generated by the PUD to a specified number of trips during the a.m. and p.m. peak hours, as determined by the Institute of Transportation Engineers Trip Generation Manual (ITE Manual). Willamette raises two assignments of error on review.
First, Willamette contends that LUBA erred in affirming the city's decision because its interpretation of Condition 3 is contrary to prior LUBA and Court of Appeals decisions, in violation of "law of the case." Respondent Alexander Loop, LLC (Goodpasture),[1] responds that Willamette failed to preserve that argument, and, in any event, it fails on its merits. As explained below, we agree with Goodpasture that Willamette's first assignment of error is unpreserved, and, therefore, we do not reach the merits. See ORAP 5.45(1) (except for discretionary plain error review, "[n]o matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court"). Second, Willamette contends that, if calculated according to the "correct" ITE Manual codes, LUBA erred in concluding that substantial evidence supports the city's determination that Phase 5 of the PUD satisfies Condition 3. Because that assignment of error necessarily depends on the correctness of its first assignment, which we do not address, we also reject Willamette's second assignment of error. Accordingly, we affirm.
The Goodpasture Island PUD is a multifamily/mixed-use development encompassing five phases, four of *759 which have been built. The development has a long and complicated history, and it has been the subject of extensive litigation over nearly a decade. For context, we recite the historical facts relevant to the present dispute-which are uncontested-from LUBA's opinion and order:
"Condition 3 [2 ] was originally imposed in 2010, as part of a decision approving the rezoning of the subject property, to facilitate approval of a proposed PUD for a large multifamily/mixed use development, *316 in five phases. To establish that the rezoning was consistent with the Transportation Planning Rule (TPR), at OAR 660-012-0060, the applicant proposed a 'trip cap' limiting the number of vehicle trips the PUD could generate during peak hours. The trip cap was designed to keep PUD traffic generation at or below what the subject property could have generated under the previous zoning, in order to avoid mitigation and other obligations the TPR would otherwise require. The trip cap numbers were based on a 2009 traffic impact analysis (2009 TIA), which used three codes from the 7th edition of the ITE Manual to estimate the number of trips the PUD would generate on full build-out, assuming a particular mix of three types of uses categorized under the ITE Manual: code 220 (Apartments), code 252 (Senior Adult Housing), and code 814 (Specialty Commercial).
"In 2011, the applicant applied to the city for final PUD approval and submitted a second TIA to demonstrate that the proposed 5-phase development would comply with Condition 3. However, the 2009 [sic ] TIA used ITE Manual code 223 (Mid-Rise Apartments) instead of code 220 (Apartments) to estimate trips generated by the unrestricted apartments proposed in several phases. The 2011 hearings officer rejected this approach, concluding that one of the purposes of Condition 3 was to 'establish a baseline by which to compare traffic impacts of future changes of use.' Accordingly, the 2011 hearings officer amended the first sentence of Condition 3 to specify that the trip cap must be determined 'using code 220-Apartments for all unrestricted residential apartments on the development site.'
"The 2009 TIA and the 2010 tentative PUD approval assumed construction of 125 senior adult housing units in *760 Phase 4. In the 2011 proceeding, the applicant instead proposed Phase 4 construction to include a mix of 22 senior adult housing units and 132 units (beds) of assisted living, [the latter of] which is represented by a different ITE Manual code, code 254 (Assisted Living) and which is a code category that generates more traffic than code 252 (Senior Adult Housing).[3 ] Apparently because of this change in the type of restricted residential uses, the hearings officer also amended Condition 3 to require that prior to construction of the final phase, Phase 5, the applicant conduct a current traffic study that counts the actual number of trips generated by the constructed phases 1-4, to determine if additional analysis or mitigation may be required under the TPR prior to construction of Phase 5. With that amendment, the 2011 hearings officer granted final PUD approval. Subsequently, on appeal, LUBA rejected all challenges to the amended Condition 3. Willamette Oaks LLC v. City of Eugene , 64 Or. LUBA 24 (2011), aff'd , 248 Or.App. 212, 273 P.3d 219 (2012)."
(Footnotes and record cites omitted.)
Before turning to the proceedings that led, ultimately, to the present review, we pause to set out Condition 3, as amended by the 2011 hearings officer (amendments are underscored):
"Prior to executing the performance agreement, the applicant shall revise the final site plan to add the following note: 'The maximum development on the site shall be limited so that it would not produce more than 287 trips in the AM peak hour and 321 trips during the PM peak hour as determined by the Institute of Transportation Engineers Trip Generation Manual, using code 220-Apartments for all unrestricted residential apartments on the development site. The city may allow development intensity beyond this maximum number of peak hours vehicle trips only if the *761 applicant submits to the city and *317 [Oregon Department of Transportation] a traffic impact analysis that demonstrates that the proposed intensification of use would be consistent with the Transportation Planning Rule (TPR) at OAR 660-012-0060. The applicant shall seek and the city shall consider such approval using the city's Type II land use application procedure. Prior to construction of the final phase, the applicant shall conduct a current traffic study that counts the actual number of trips currently occurring to determine if the final phase would require a revised traffic impact analysis and additional improvements to comply with the Transportation Planning Rule. The city shall not issue building permits for the final phase until the applicant has received approval of the revised traffic impact analysis."
In 2017, after the first four phases of the PUD were built, Goodpasture applied for Phase 5 approval, proposing 186 unrestricted apartments. As contemplated by the modification of Condition 3, it submitted a then-current traffic study of trips generated during peak hours under the constructed Phases 1 to 4. That traffic count, added to the estimated peak hour traffic to be generated in Phase 5 using ITE code 220 (apartments) was less than the trip cap set out in the first sentence of Condition 3. The hearings officer concluded that that was sufficient to demonstrate that proposed Phase 5 of the PUD complied with Condition 3; it rejected Willamette's argument that Goodpasture must also demonstrate that the first sentence of Condition 3 was satisfied-that is, that maximum development on the site also did not exceed the trip cap as determined under the ITE manual . On appeal, LUBA disagreed and remanded the decision for the hearings officer to decide that question. Willamette Oaks LLC v. City of Eugene , --- Or. LUBA ----, ---- (LUBA No. 2017-058, October 5, 2017) (slip op. at 11) (holding that the third requirement of Condition 3 is intended to supplement, rather than replace, the first requirement; thus, "the final phase applicant must submit both (1) an analysis of whether the maximum development on the site (all five phases) does not exceed the trip cap specified in the first requirement [of Condition 3], as determined under the ITE manual, and (2) a current traffic study of traffic generated by the prior built phases").
*762 On remand, Goodpasture submitted a letter from its traffic engineer asserting that up to 193 unrestricted apartment units-more than the 186 units that Goodpasture proposed-could be built in Phase 5 without exceeding the trip cap in Condition 3. The letter explained that the calculations were based on the ITE Manual codes consistent with those assumed in the 2009 TIA, which was "the basis for the original trip generation estimates and established trip cap." Thus, as LUBA explained in its order on review,
"the traffic engineer used the same three ITE Manual codes used in the 2009 TIA: 220 (Apartments), 252 (Senior Adult Housing), and 814 (Specialty Commercial), but updated the number of units to reflect those actually built during phases 1-4 and proposed in phase 5. Thus, instead of multiplying the senior housing rate by the 125 units of senior adult housing assumed in the 2009 TIA, the traffic engineer multiplied the rate by the number of senior adult housing units and assisted living units (beds) actually built in phase 4."
Willamette raised two objections, one of which is relevant here.[4] Specifically, Willamette objected to the use of the ITE Manual code and rate applicable to Senior Adult Housing (ITE Manual code 252), rather than the code and rate applicable to the 132 Assisted Living units (ITE Manual code 254) that were actually constructed in Phase 4. According to Willamette, using that code, the trip cap would allow for only 167 additional apartment units, not the 186 proposed by Goodpasture; therefore, Phase 5 exceeded the limit imposed in Condition 3.
The hearings officer rejected Willamette's objection, reasoning that "the intent of the 2011 amendments to Condition 3 was to require *318 a consistent 'baseline' to evaluate compliance with the trip cap, by using the same ITE Manual codes used in initially setting the trip cap." Thus, the hearings officer decided that Phase 5 satisfied the trip cap in Condition 3.
As discussed in more detail below, Willamette appealed the city's decision to LUBA, and LUBA affirmed. Willamette *763 seeks review of LUBA's final opinion and order affirming the city, raising two interrelated assignments of error.
Willamette's first assignment of error states:
"LUBA erred in finding that Condition #3 was satisfied by allocating trips under the ITE for uses specified in Applicant's initial 2009 TIA rather than allocating trips under the ITE from the uses in Applicant's 2010 TIA that were actually permitted and built on Parcel 4 as expressly required by LUBA in its 2010 and 2011 decisions and by the Court of Appeals in its 2012 decision ."
(Emphasis added; boldface and footnotes omitted.) Willamette contends that those three decisions-LUBA's decisions in Willamette Oaks, LLC v. City of Eugene , 63 Or. LUBA 75 (2011) (Willamette I ), and Willamette Oaks, LLC v. City of Eugene , 64 Or. LUBA 24 (2011) (Willamette II ), and our decision affirming Willamette II in Willamette Oaks, LLC v. City of Eugene , 248 Or.App. 212, 273 P.3d 219 (2012) ( Willamette III )-required the hearings officer, in assessing whether Condition 3 was satisfied, to apply the ITE Manual codes associated with the uses for which Willamette ultimately obtained final PUD approval and that were actually permitted and built in Phase 4-that is, primarily assisted living (ITE Manual code 254) rather than Senior Adult Housing (ITE Manual code 252)-in calculating traffic generation for purposes of the trip cap.
According to Willamette, those cases "have previously held that trips be allocated, for purposes of ITE analysis, once building permits are obtained for each phase in accordance with the permitted uses." For example, Willamette points out that, in denying its earlier objection that the trip cap was invalid because it did not include an enforcement mechanism, LUBA stated, in part:
"[Goodpasture] first responds that to the extent any monitoring or enforcement of a condition is required, the trip cap is monitored and enforced when the city receives an application for a building permit under the final, approved PUD and site plan and then allocates from the trip cap the number of trips associated with a particular use at the time a building permit is issued for that use. According to [Goodpasture], after all of the trips within the trip cap have been allocated, no further development of the property can *764 occur unless the trip cap is increased. The city will monitor trips by monitoring the building permits issued as development occurs. While the condition of approval does not provide quite that level of detail about how the trip cap condition will be enforced, evidence in the record supports the city's conclusion that the trip cap is enforceable."
Willamette I , 63 Or. LUBA at 94. See also Willamette II , 64 Or. LUBA at 45 (quoting portions of that passage from Willamette I ). Willamette also relies on our 2012 opinion affirming Willamette II , in which we stated, "Both in its original and modified form, the condition 'is monitored and enforced when the city receives an application for a building permit under the final, approved PUD and site plan and then allocates from the trip cap the number of trips associated with a particular use at the time a building permit is issued for that use.' " Willamette III , 248 Or.App. at 223, 273 P.3d 219 (quoting Willamette I , 63 Or. LUBA at 94).
Based on those statements, Willamette concludes, LUBA (and the city's) decision that Goodpasture satisfied Condition 3 "by assuming 150 units of [Senior Adult Housing] (ITE Code 252) and zero units of Assisted Living [ (ITE Code 254) ] * * * is clearly inapposite with how LUBA and the Court of Appeals previously interpreted Condition #3 and therefore violates the law of the case ." (Emphasis added.) See State v. Pratt , 316 Or. 561, 569, 853 P.2d 827, cert. den. , 510 U.S. 969, 114 S.Ct. 452, 126 L.Ed.2d 384 (1993) ("[I]t is a general principle of law * * * that when a ruling or decision has *319 been once made in a particular case by an appellate court, while it may be overruled in other cases, it is binding and conclusive both upon the inferior court in any further steps or proceedings in the same litigation and upon the appellate court itself in any subsequent appeal or other proceeding for review." (Internal quotation marks omitted.) ); Gould v. Deschutes County , 272 Or.App. 666, 686, 362 P.3d 679 (2015) (interpretive issues decided by LUBA in earlier phase of a case are law of the case and therefore binding on county, the inferior body, in further proceedings in same litigation, and LUBA, the appellate body, in any subsequent appeal).
The problem with that argument is that Willamette has not established that it made that argument below. As noted, ORAP 5.45(1) provides, in part, that "[n]o matter *765 claimed as error will be considered on appeal unless the claim of error was preserved in the lower court."[5] We apply the preservation requirement to administrative proceedings, including review of LUBA orders and opinions. Barnes v. City of Hillsboro , 239 Or.App. 73, 81, 243 P.3d 139 (2010) ; VanSpeybroeck v. Tillamook County Camden Inns, LLC , 221 Or.App. 677, 690, 191 P.3d 712 (2008).
Each assignment of error in the appellant's opening brief must therefore "demonstrate that the question or issue presented by the assignment of error timely and properly was raised and preserved in the lower court." ORAP 5.45(4)(a). Specifically, for each assignment of error, the brief must contain a subheading entitled "Preservation of Error" that (1) "specif[ies] the stage in the proceedings when the question or issue presented by the assignment of error was raised in the lower court, the method or manner of raising it, and the way in which it was resolved or passed on by the lower court," ORAP 5.45(4)(a)(i), and (2) sets out pertinent quotations from the record where the issue was raised and resolved, together with page number references to the record, or the excerpt of record if the quoted material is set out in the excerpt of record, ORAP 5.45(4)(a)(ii).
Here, in its preservation of error section related to its first assignment of error, Willamette states-in full-"Petitioner has raised, briefed, and argued this issue at all levels in all previous proceedings. ER-97." That single citation to the record is insufficient to establish Willamette's preservation of the issue before LUBA (much less "at all levels in all previous proceedings"). It directs us to one page in Willamette's petition for review before LUBA. There, to be sure, Willamette raises the argument that the hearings officer used the wrong ITE use codes and rates for Phase 4 in calculating whether Phase 5 would cause the PUD to exceed the trip cap in Condition 3. Its assignment of error appearing on that page states, "The Hearings Official misapplied Condition 3 by relying on uses from Applicant's 2009 TIA that were never built rather than uses included in the final approved PUD and actually built." (Emphasis added;
*766 boldface omitted.) Willamette also explains that the hearings officer "should have used the ITE use code and rates for Parcel 4 that Applicant included with its revised TIA associated with uses proposed and subsequently approved in its final PUD because those uses were actually built on Parcel 4 and therefore generate the relevant trips to the site." (First and third emphases added; second emphasis in original.)
But that is a qualitatively different argument than Willamette makes in its first assignment of error to us-that the hearings officer was legally precluded by the law of the case doctrine (based on the three opinions cited above) from assessing Phase 5's compliance with the trip cap using ITE Manual codes specified in the 2009 TIA, rather than according to the uses that were actually built in Phase 4. Nowhere at ER-97 does that argument appear.
Moreover, although we are not required to comb the record to determine if an error was properly raised and preserved, ORAP 5.45(4)(a) ; Holbrook v. Precision Helicopters, Inc ., 162 Or.App. 538, 544, 986 P.2d 646, rev. den. , 329 Or. 527, 994 P.2d 128 (1999), our review of Willamette's LUBA petition as a *320 whole similarly does not reveal that Willamette articulated to LUBA the law of the case theory it now presents to us. Rather, Willamette contended before LUBA that the hearings officer erred in "refusing to acknowledge that factual circumstances had changed since 2009"-specifically, that, in 2010, Goodpasture had changed the land uses approved in the 2009 TIA, and, therefore, those uses do not reflect the development for which Goodpasture obtained final PUD approval for and actually built in Phase 4. Thus, according to Willamette, there was "simply no rational explanation" for determining compliance with Condition 3 based on the 2009 ITE use codes, as the hearings officer had done. It further argued that the hearings officer's decision would "effectively undo" the 2011 modification of Condition 3.[6]
In the context of that argument, Willamette noted that, "in fact, [Goodpasture] and LUBA have already agreed with [Willamette's] position on how to apply Condition 3 under the ITE," referencing Goodpasture's argument and *767 LUBA's discussion of the trip cap in Willamette I (quoted above). Of significance, however, Willamette did not contend that LUBA's statement in Willamette I constituted a legal ruling that had preclusive effect as to the issue to be decided by the hearings officer. See Hayes Oyster Co. v. Dulcich , 199 Or.App. 43, 53, 110 P.3d 615, rev. den. , 339 Or. 544, 125 P.3d 750 (2005) ("The [law of the case] doctrine does not apply to 'every statement about the law or the facts that the court happens to venture in the course of rendering its decisions.' Blanchard v. Kaiser Foundation Health Plan , 136 Or.App. 466, 470, 901 P.2d 943, rev. den. , 322 Or. 362, 907 P.2d 248 (1995). Rather [it] applies to the portions of a prior appellate opinion that were necessary 'to the disposition of the appeal.' Id. "). In other words, Willamette contended before LUBA that the hearings officer erred in her interpretation of Condition 3, but not for the reason that law of the case compelled a different answer.[7]
In sum, we fail to see how LUBA would have been alerted that (as Willamette now contends) the law of the case-specifically LUBA's 2010 and 2011 decisions and this court's 2012 opinion in Willamette III (the latter two of which Willamette never mentions in its LUBA petition)-prevented the hearings officer from understanding Condition 3 to apply the way it did. As we have previously emphasized, the statutory framework for review of quasi-judicial local government land use decisions " 'suggests that issues be preserved at the local government level for board review, and at LUBA level for judicial review, in sufficient detail to allow a thorough examination of the issue by the decision-maker, so as to potentially obviate the need for further review or at least to make that review more efficient and timely.' " Willamette III , 248 Or.App. at 225, 273 P.3d 219 (quoting VanSpeybroeck , 221 Or.App. at 691 n. 5, 191 P.3d 712 ). That detail is entirely missing here. And, "[j]ust as a court, LUBA is not obligated to make or develop a party's arguments when the party does not endeavor to do so itself." Barnes , 239 Or.App. at 81, 243 P.3d 139. We find that principle to be particularly apt here, considering the complex, *768 multi-layered litigation between these parties. We conclude that Willamette's first assignment of error is unpreserved, and we therefore decline to address it.
Given that conclusion, Willamette's second, interrelated, assignment of error requires little discussion. In that assignment, Willamette asserts that "LUBA erred in concluding that there was substantial evidence in the record to support a determination that [Goodpasture's] proposed development would satisfy Condition #3 and generate fewer trips than permitted by the trip cap set forth in Condition *321 #3." (Boldface omitted.) Specifically, it argues:
"There is no dispute that if you interpret Condition #3 to require the use of ITE code 254 (Assisted Living) for the Assisted Living units actually built on Parcel 4, [Goodpasture's] proposed development on Parcel 5 causes the PUD to exceed the trip cap and, as a result, [Goodpasture] cannot satisfy Condition #3. [Goodpasture] did not present any evidence below to contradict [Willamette's] evidence that if the correct ITE use codes and rates are used for Parcel 4 that [Goodpasture] cannot construct the proposed 186 units on Parcel 5 without exceeding the trip caps and therefore cannot satisfy Condition #3."
(Emphases added.) Thus, as Willamette itself recognizes, its second assignment of error is necessarily dependent on the conclusion that it was error for the hearings officer to calculate compliance with the trip cap in Condition 3 in the manner that it did, the subject of Willamette's first assignment of error. We have rejected that assignment as unpreserved. Willamette makes no other argument that LUBA misunderstood or misapplied its substantial evidence standard of review of the city's decision. See ORS 197.850(9)(a) ; Citizens for Responsibility v. Lane County , 218 Or.App. 339, 346, 180 P.3d 35 (2008) ("We must affirm LUBA's decision if it properly understood and applied the substantial evidence test contained in ORS 197.835(9)(a)(C)."). Accordingly, we reject Willamette's second assignment of error as well.
Affirmed.

Respondent Alexander Loop, LLC, which intervened below, is successor-in-interest to the applicant, Goodpasture Partners, LLC. We follow Alexander Loop, LLC's lead in referring to itself as Goodpasture. Respondent City of Eugene waived appearance on appeal.

Condition 3 is set out in full below. 295 Or.App. at 760-61, 437 P.3d at 316-17.

As LUBA explained,
"[u]nder the ITE Manual, trip generation numbers are derived by multiplying a peak hour number by the unit associated with the relevant code. For example, for code 252 (Senior Adult Housing), the unit is the dwelling unit, and the number for the a.m. peak hour is .08 per dwelling unit. For code 254 (Assisted Living), the relevant unit is the number of beds, and the applicable a.m. peak hour number is .14. The higher number for assisted living units (beds) presumably reflects traffic associated with increased numbers of support staff."

Willamette's first objection challenged the edition of the ITE Manual used by the hearings officer, which the hearings officer and LUBA both rejected. Willamette does not raise that issue on review.

The court has discretion to review an error that is plain, ORAP 5.45(1) ; Willamette does not request that we exercise that discretion in this case.

Willamette also objected to the hearings officer "supporting her [decision] with an erroneous argument that [Goodpasture] itself never even raised."

Willamette asserts that a footnote in LUBA's opinion demonstrates that it had preserved its law of the case argument. We disagree. The identified footnote does not, under our well-established preservation principles, establish that LUBA understood Willamette to be contending that law of the case prevented the hearings official from using the ITE Manual codes from the 2009 TIA in calculating whether Phase 5 would comply with the trip cap in Condition 3.